Filed 12/24/15 (reposting to provide page numbers)

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S115872 |
| v. | ) | |
| | ) | Los Angeles County |
| RAMON SANDOVAL, JR., | ) | Super. Ct. No. BA240074 |
| | ) | |
| Defendant and Appellant. | ) | |
| _____ | ) | |

Defendant Ramon Sandoval, Jr. was convicted following a jury trial of the premeditated murder of Long Beach Police Detective Daryle Black and the attempted murder of his partner, Detective Rick Delfin. The jury found that the murder was committed with the special circumstances that the victim was a peace officer engaged in the lawful performance of his duties and that it was committed for the purpose of preventing a lawful arrest, by means of lying in wait, and to further the activities of a criminal street gang. The jury fixed the penalty at death. This appeal is automatic. (Pen. Code, § 1239, subd. (b); all undesignated statutory references are to this code.) We reverse the special circumstance finding that Sandoval committed the murder by means of lying in wait, but otherwise affirm the judgment.

## I. FACTS

On February 9, 2001, a Los Angeles County Grand Jury returned an indictment against defendant Ramon Sandoval and codefendants Adolfo

Bojorquez and Miguel Camacho. Bojorquez and Camacho are not parties to this appeal. The indictment charged Sandoval with the April 2000 murder of Long Beach Police Detective Daryle Black. (§ 187, subd. (a).) It also charged the special circumstances that the victim was a peace officer engaged in the lawful performance of his duties (§ 190.2, subd. (a)(7)), that the murder was committed for the purpose of preventing a lawful arrest (§ 190.2, subd. (a)(5)) and by means of lying in wait (§ 190.2, subd. (a)(15)), and that defendant was an active participant in a criminal street gang and committed the murder to further the activities of the gang (§ 190.2, subd. (a)(22)).

The indictment further charged Sandoval with the willful and premeditated attempted murder of Long Beach Police Detective Rick Delfin while Detective Delfin was in the lawful performance of his duties (§§ 664, subds. (e), (f); 187, subd. (a)) and assault with an assault weapon on a peace officer in the lawful performance of his duties (§ 245, subd. (d)(3)). The indictment also charged Sandoval with assaulting Maria Cervantes with an assault weapon (§ 245, subd. (d)(3)). The indictment alleged that Sandoval committed several of these offenses for the benefit of a street gang (§ 186.22, subd. (b)(1)) and that he personally discharged an assault weapon (former § 12022.53, subds. (c), (d), (e)(1)).

### A.    Guilt Phase

Trial began on September 23, 2002. In his opening statement, defense counsel acknowledged that Sandoval was a gang member and that he had confessed he shot and killed Detective Black and injured Detective Delfin, adding: "The thing we are contesting was that Ramon Sandoval did not lie in wait on Lime Avenue to kill Detective Black. We think the evidence will show that was strictly a spontaneous, bizarre event that just occurred. Had those officers come by one minute earlier or one minute later, they wouldn't have been shot."

2

According to Sandoval's confession, which was tape-recorded and played for the jury, he was a member of the Barrio Pobre gang and goes by the moniker "Menace." On April 29, 2000, Sandoval and about 15 other members of the Barrio Pobre gang were drinking outside an abandoned house in Compton when a car pulled up. Someone in the car yelled "Fuck BP" and "East Side," and began shooting at them. No one was hit, and the car drove away. Sandoval and his fellow gang members believed the shooting was committed by a rival gang named East Side Paramount.

Sandoval and several members of his gang decided to retaliate. Sandoval retrieved an assault weapon, an AR-15, from a fellow gang member, and they went to the home of Vincent Ramirez, known as "Toro," who was a "shot caller" or leader of the East Side Paramount gang. They knew that Toro was having a birthday party at his house on Lime Avenue between 19th and 20th Streets in Long Beach. They intended to knock on the door and kill Toro.

Sandoval, carrying the assault weapon, rode in a red Chevrolet Beretta driven by Juan Camacho ("Pipas"), the brother of codefendant Miguel Camacho (Camacho or "Rascal"). They followed Camacho, Adolfo Bojorquez ("Grumpy"), and Julio Del Rio ("Sparky"), who were riding in a Honda. They pulled to the curb near Toro's house on the west side of Lime Avenue, facing south. Sandoval got out of the car, still carrying the assault weapon, and saw Camacho walking on the sidewalk on the east side of the street towards Toro's house. Sandoval was about to join him when he saw a police car driving down Lime Avenue, so Sandoval ducked behind the Beretta. The car was unmarked, but Sandoval recognized it as a police car, in part because of the spotlights mounted on the sides.

Sandoval saw that there were two police officers in the car, and they were looking at Camacho. Sandoval knew Camacho was on parole and was violating

3

the terms of his parole because he was armed with a .45-caliber handgun.  To "save" Camacho from "going to jail," Sandoval stood up and opened fire on the police car.  Sandoval said the officers "didn't know what to do" because "[t]hey didn't know where . . . the bullets were coming from" "['c]ause they didn't see me."

Detective Delfin confirmed that he did not see Sandoval until Sandoval began shooting.  Detective Delfin testified that he was driving an unmarked police car southbound on Lime Avenue accompanied by Detective Black.  They were part of the gang unit.  He noticed a car that was double-parked "about midblock" and saw Camacho standing "by the back bumper."  Detective Delfin "slowed up and stopped about two car lengths behind that car" as Camacho began walking east across the street.  Detective Delfin continued to look to his left, watching Camacho.  He was about to get out of the car and talk to Camacho when "someone up to my right . . . started unloading on our police car with [what sounded like] an assault weapon."  He said, "I did not know anybody was on that side of the car, sir, until they started shooting."  "First shot, I don't think it did anything.  But the ones following the first shot shattered the windows; window exploded, broke.  The car was getting torn apart inside the interior.  Debris is flying.  Then I caught a round on the side of the head."

Jimmy Falconer was driving on Lime Avenue and witnessed the shooting.  He said there was nothing the police officers could do:  "It was sort of like a kind of ambush.  I'm not saying set-up ambush, but if it was gonna be an ambush, this would be the way to do it.  They didn't have time.  They were preoccupied with [Camacho].  They were getting ready to jack him across the street, but then the gunfire opened up from across the — from this other side of the street . . . ."  "[T]hey didn't see it coming."

4

Officers responding to Detective Delfin's radio call for assistance took Detective Black to the hospital, where he died from a gunshot wound to his head. Detective Delfin had been shot in the head and right knee. Police found 28 expended shell casings at the crime scene.

Maria Cervantes also was shot. She had been lying in her bed in her home on Lime Avenue when she was shot in her leg and abdomen. She was about eight months pregnant, but her unborn child was not injured.

About 20 minutes after the shooting, police found Camacho hiding in the backyard of a nearby house. Camacho assisted police "in trying to locate the shooter" in this case.

On May 2, 2000, police executed a search warrant for Sandoval's residence and arrested Sandoval. A red Chevrolet Beretta was parked behind the residence, and an AR-15 assault weapon, covered by a towel, was found behind the stove. Ballistics tests revealed that this was the rifle that had been used to shoot Detectives Black and Delfin.

## B. Penalty Phase

The first penalty phase commenced on October 23, 2002, but the court declared a mistrial after the jury was unable to reach a verdict. The penalty phase retrial began on March 17, 2003.

### i. *Prosecution Case*

Many of the witnesses who had testified during the guilt phase testified at the second penalty phase and described the circumstances of the crime. This testimony included information about the Barrio Pobre gang, Sandoval's and Camacho's participation in the gang, and the gang meeting just before the shooting on Lime Avenue. Detective Delfin gave a detailed description of the shooting.

5

The prosecution also introduced evidence of an uncharged crime in which Sandoval and Camacho killed Jesus Cervantez and attempted to kill Steve Romero at a McDonald's restaurant in Lynwood six months before Detective Black's murder. The victims in that incident were members of a tagging crew called Just Kicking It, who earlier had committed a drive-by shooting aimed at Sandoval and his gang. Sandoval admitted he used an AK-47 against the crew members to retaliate for the drive-by shooting.

As part of the prosecution's victim impact evidence, several of Detective Black's friends and siblings testified to his gentle demeanor and noted his compassion toward and desire to have children. Detective Delfin also testified to the emotional strain caused by the knee injury he sustained during the shooting, which rendered him unable to work. His wife testified to the emotional and physical impact of the incident on both her husband and their three young children.

### ii. Defense Case

Sandoval was born on August 8, 1981 to parents who had emigrated to the United States from Mexico. He was 18 years old at the time of the Lime Avenue shooting.

Sandoval's family moved around frequently and struggled to pay the bills during his childhood. Members of Sandoval's extended family testified to his behavior as a child, describing him as a "normal boy," "a good child," and "very easy going." Multiple witnesses described his soccer abilities as a young teenager. Sandoval's soccer coach also described a family situation that "maybe affected [defendant]": during the last season in which Sandoval played soccer, his father began an affair with the coach's niece.

6

Sandoval's mother testified to her love for her son. She explained that gangs had been present in their neighborhood while he was growing up. In addition to moving homes, she and her husband twice sent Sandoval to live with relatives during his teenage years in an effort to remove him from gang influence. The defense presented evidence of the increasing pressure Sandoval felt to join a gang, his efforts to protect his younger brother from gangs, and the overall influence of gangs on poor urban youth.

## II. PRETRIAL ISSUES

### A. Motion to Suppress Evidence

Sandoval argues that the trial court erred by relying upon extrajudicial findings in denying his motion to suppress evidence and in failing to conduct an evidentiary hearing. Defendant seeks "a remand for a full and fair hearing."

Before trial, Sandoval filed a motion to suppress the statements he made to police following his arrest, to quash the warrant used to search his residence and automobile, and to suppress all evidence obtained as a result of these searches. He asked for a de novo hearing pursuant to *Franks v. Delaware* (1978) 438 U.S. 154 (*Franks*). The warrant was based upon the 12-page declaration of Long Beach Police Officer Steven F. Smith, which was executed on April 30, 2000, and described in detail the murder of Detective Black and the shooting of Detective Delfin and Maria Cervantes the night before, including the fact that there were 17 bullet holes in the right side of the officers' police car and 28 shell cases from a .223-caliber firearm recovered at the crime scene. These types of shells would have been "fired from an AR-15 assault rifle or a Ruger Mini-14." Another officer had interviewed Detective Delfin at the hospital, and Detective Delfin said he had stopped his police car behind a parked car. A young "male Hispanic" was standing by the open driver's side door, and another "male Hispanic" left from the

7

passenger side of the parked car and ran across the street. Detective Delfin then heard gunfire from a semi-automatic weapon, such as an AK-47, and was struck by bullets in his knee and head.

Officer Smith declared that shortly after the shooting, Camacho was found "hiding in the courtyard" of a nearby residence. Camacho first claimed he had been chased by a group of black males and told the officers they could " '[c]heck with Detective Delfin,' " who could vouch for his credibility. When told that Detective Delfin was one of the officers who had been shot, Camacho "broke down in tears" and told the officers that "a fellow member of the Compton Barrio Pobre gang, named Ramon Sandoval," was responsible for the shooting. Camacho admitted he was on parole from the California Youth Authority. His record showed he had been convicted of assault with a deadly weapon (§ 245, subd. (a)(1)), and there was a warrant for his arrest for a parole violation.

Camacho told the officer that Sandoval was armed with an AR-15 assault weapon. Camacho crossed the street and began walking as the police car arrived. When the police car stopped, Camacho heard several loud gunshots and saw Sandoval "firing the AR-15 into the passenger side door area of the car." Camacho ran and hid in the courtyard, where police found him. Camacho identified Sandoval from a photo lineup and led officers to Sandoval's house. Officers confirmed that Sandoval lived at that residence.

The affidavit recounted that a vehicle driven by Jimmy Falconer was making a U-turn nearby when the shooting started. Falconer had seen the officers' car pass him and knew it was a police car because it had spotlights mounted on each side. Falconer saw a Hispanic male cross to the east side of the street, and the police car moved toward him "as if the officers were going to make contact with that subject." Falconer noticed another Hispanic male on the west side of the street, leaning over the roof of a car and pointing a gun at the passenger side of the

8

police car. The Hispanic male, whom Falconer described as about 25 years old with a shaved head and a mustache, fired multiple rounds at the police car. Falconer turned his car around and left the area.

The affidavit noted that Camacho's statement that he crossed to the east side of the street was corroborated by the fact that both Detective Delfin and Falconer had seen a Hispanic male cross to the east side of the street.

The search warrant was issued and was executed the following morning, resulting in Sandoval's arrest and the discovery of an AR-15 assault weapon that ballistics tests later determined to be the murder weapon. Following his arrest, Sandoval confessed to the crimes.

Citing *People v. Campa* (1984) 36 Cal.3d 870, Sandoval argued that the search warrant was not supported by probable cause because "the magistrate had no reason to conclude that Camacho gave *reliable* information" linking him to the crime: "Camacho, a convicted criminal on parole, found in extremely suspicious circumstances during the investigation of a notorious crime, had every reason to try to throw the suspicion off himself, and on to another person." Sandoval also argued that the affidavit in support of the warrant had two "glaring" omissions. First, the affidavit did not reveal that Camacho was a notorious gang member who was suspected of committing two other homicides. Second, the affidavit did not reveal that the day before, another Long Beach police officer had obtained a warrant on a different theory, "that black Crip members in Long Beach had killed Detective Black in retaliation for the April 28, 2000 killing of Crip gang member Billy James Johnson."

The prosecution responded that, unlike in *Campa*, police thought Camacho was "a witness to the crime who knew the shooter, saw the crime, and was distraught when informed that one of the victims was detective Delfin." Also unlike in *Campa*, the affidavit described the circumstances in which Camacho

9

made his statements, and those statements were corroborated by the statements of Detective Delfin and Falconer. The prosecution argued in the alternative, citing *United States v. Leon* (1984) 468 U.S. 897, that even if the warrant was defective, the evidence should not be suppressed because the officers acted in good faith.

The prosecution argued that Sandoval's claim of material omissions in the affidavit was insufficient to warrant an evidentiary hearing because the motion to suppress evidence failed to show how the affiant "could have known that another police agency was investigating Camacho's *possible* involvement in other crimes." Nor was an evidentiary hearing required by Sandoval's claim that the affidavit should have disclosed that an earlier search warrant had been obtained on the theory that Crips gang members might have committed the murder as retaliation. The fact that law enforcement had investigated other leads had no bearing on whether probable cause existed to issue the warrant to search Sandoval's home and car. Sandoval did not show that these facts were deliberately omitted or omitted with reckless disregard of the truth.

Regarding the claim that the affidavit contained material omissions, the trial court noted that defense counsel was "making a lot of assumptions" — for example, that Detective Smith knew that Camacho was being investigated for other homicides and deliberately withheld that information. Defense counsel replied, "That's correct," but asked for "a hearing, very brief hearing, and if Detective Smith wants to come in and say I had no idea Camacho was just out of Youth Authority; I had no idea there was a warrant out for him . . . ; I had no idea he was wanted for a Carson murder, that's fine. [¶] If that's reasonable, and the court believes it, then it should deny the motion, but seems to me that the assumptions we're making in this motion are the more reasonable ones . . . ."

The trial court denied the motion. The court found that "the magistrate had overwhelming evidence to issue the warrant and not just probable cause."

Camacho's statements were corroborated in part by the statements of Detective Delfin and Falconer: "Those three statements about what they each saw dove-tailed with one another." The trial court added that "Camacho was not a suspect, . . . the police were treating him as a witness at that time." The affidavit did not contain material omissions. "[T]he magistrate was faced with information that Mr. Camacho was not an innocent citizen informant by any stretch. [¶] . . . [T]here was a statement about the fact he was on CYA parole; that he had been arrested for a parole violation, and there was a warrant out; that he had a conviction for assault with [a deadly weapon under section] 245A1; that he was a gang-banger . . . . So the magistrate already knew that he had a criminal history. Whether or not any other information of other violations would have added to the magistrate's decision is highly questionable."

In denying Sandoval's request for an evidentiary hearing, the trial court quoted at length from *Franks*, *supra*, 438 U.S. 154, and said: "It's clear to this court that counsel had not made that *Franks* showing that is mandated under the law. In fact, as you have stated consistently, these are assumptions you're making based on your interpretation of what you knew about the case and not based on anything that the police knew. So it's denied."

A week later, on September 26, 2002, Sandoval filed a "Supplemental 1538.5 Motion" that asked the trial court to "reopen" the motion to suppress evidence "in order to take into account evidence of which the defendant was unaware at the time of the initial motion." The supplemental motion asserted that defense counsel had just received a reporter's transcript of a hearing in a motion to suppress evidence brought by Camacho. Based upon this transcript, defense counsel argued that Camacho's statements to the police were involuntary because, among other reasons, Camacho had been denied counsel and had been deprived of sleep. The trial court ruled: "I have reviewed the motion, and . . . I don't see

11

where any of this changes the circumstances . . . . Most of the statements . . . Mr. Camacho made during . . . his own motion to try and suppress his statement. My recollection is the court found him to be far less than a credible witness. In fact, most of what he said was absurd. . . . I don't see how the additional statements that the defense offered would warrant a *Franks* hearing and would be grounds for altering the ruling the court has already given."

Defendant argues that he was erroneously denied an evidentiary hearing under *Franks*'s holding that "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." (*Franks*, *supra*, 438 U.S. at pp. 155–156.) The high court added that "the rule announced today has a limited scope, both in regard to when exclusion of the seized evidence is mandated, and when a hearing on allegations of misstatements must be accorded." (*Id*. at p. 167.) Reiterating the "presumption of validity with respect to the affidavit supporting the search warrant," *Franks* explained that "[t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. . . . Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. . . . [A]nd if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." (*Id*. at pp. 171–172, fn. omitted.)

12

This court has applied the rule in *Franks* to deliberate omissions of material facts from an affidavit for a search warrant: "A defendant can challenge a search warrant by showing that the affiant deliberately or recklessly omitted material facts that negate probable cause when added to the affidavit." (*People v. Eubanks* (2011) 53 Cal.4th 110, 136.) We have recognized that a claim that material facts were omitted from an affidavit differs from a claim that the affidavit contains falsehoods: "Though similar for many purposes, omissions and misstatements analytically are distinct in important ways. Every falsehood makes an affidavit inaccurate, but not all omissions do so. An affidavit need not disclose every imaginable fact however irrelevant. It need only furnish the magistrate with information, favorable and adverse, sufficient to permit a reasonable, common sense determination whether circumstances which justify a search are probably present. [Citations.]" (*People v. Kurland* (1980) 28 Cal.3d 376, 384.) "[A]n affiant's duty of disclosure extends only to 'material' or 'relevant' adverse facts." (*Ibid*.) "[F]acts are 'material' and hence must be disclosed if their omission would make the affidavit *substantially misleading*. On review under section 1538.5, facts must be deemed material for this purpose if, because of their inherent probative force, there is a substantial possibility they would have altered a reasonable magistrate's probable cause determination." (*Id.* at p. 385.)

"We review the denial of a *Franks* hearing de novo. [Citation.]" (*People v. Panah* (2005) 35 Cal.4th 395, 457.) Sandoval was not entitled to an evidentiary hearing because he made only conclusory allegations that admittedly were based upon assumptions. This is not sufficient. (See *Franks*, *supra*, 438 U.S. at p. 171 ["Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."].) Sandoval demonstrated no "more than a mere desire to cross-examine." (*Ibid*.; *People v. Panah*, *supra*, 35 Cal.4th at p. 456.)

No evidentiary hearing would have been required even if Sandoval had supported his claims with affidavits or sworn statements because the material that he asserts was deliberately omitted from the affidavit was not material; its absence did not "make the affidavit *substantially misleading*." (*People v. Kurland*, *supra*, 28 Cal.3d at p. 385.) We address each of Sandoval's claims in turn.

Sandoval argues that the affidavit should have disclosed that police had earlier obtained a warrant from a different judge to search the home of a member of the Crips gang who lived on Lime Avenue, on the theory that Detective Black was murdered in retaliation for an officer-involved shooting of a Crips gang member. The affidavit in support of this earlier warrant stated that on April 28, 2000, the day before Detectives Black and Delfin were shot, a Long Beach police officer shot and killed Crips gang member Billy James Johnson during an armed confrontation. Johnson had lived with his mother at 1992 Lime Avenue. The next day, a Long Beach police officer was told, "you killed one of my homies last night, there's gonna be payback." Later that day, Detectives Black and Delfin were shot on the 1900 block of Lime Avenue. Police obtained a search warrant for the residence of Johnson's mother at 1992 Lime Avenue.

The fact that police initially suspected that the Crips had shot Detectives Black and Delfin in retaliation for an officer-involved shooting of a Crips gang member the day before had no bearing on the existence of probable cause to search Sandoval's home. During the investigation of a crime, police often will pursue theories that do not turn out to be true. The police would have been remiss if they had not investigated whether Detective Black's murder was linked to the death the day before of a gang member who had lived on the same block where the officers were shot. The issuance of this earlier warrant was irrelevant to the question of whether there was probable cause to search Sandoval's residence and

14

automobile, and the omission of this evidence from the affidavit did not render it substantially misleading.

Sandoval also argues that the affidavit failed to disclose that the police deemed Camacho "a suspect, and not a mere witness," that Camacho was a suspect in two other pending homicide investigations, and that he was a member of the Barrio Pobre gang. The record before us does not support these allegations. The affidavit disclosed that Camacho was a member of the Barrio Pobre gang, that he had been convicted of assault with a deadly weapon and was on parole from the California Youth Authority, and that there was a warrant for his arrest for violating parole. Sandoval produced no evidence that the police considered Camacho a suspect rather than a witness. It was not until Sandoval was arrested and implicated Camacho that the police considered Camacho a suspect. Finally, Sandoval produced no evidence that the affiant knew Camacho was a suspect in two unrelated homicides. Sandoval has shown no more than that it was possible that the affiant could have discovered that fact; Sandoval made no showing that the affiant actually knew that fact. As the trial court observed, "the magistrate already knew that [Camacho] had a criminal history. Whether or not any other information of other violations would have added to the magistrate's decision is highly questionable."

Sandoval's supplemental motion to suppress evidence, like the original motion, was not supported by affidavits or sworn statements. It alleged that Camacho had filed a motion to suppress evidence in his separate prosecution on the ground that his statements to police were involuntary. Sandoval argued that his statements to police were the fruit of Camacho's involuntary statements, that the affidavit failed to disclose that Camacho's statements were involuntary, and that it failed to disclose that a sergeant in the Los Angeles County Sheriff's Department had earlier spoken to a sergeant in the Long Beach Police Department

15

gang unit, which allegedly showed that the Long Beach Police Department had access to information about homicides investigated by other law enforcement agencies.

The supplemental motion did not show that any of the allegations in Camacho's motion to suppress evidence were true. It did not show that Camacho's statements were involuntary or that the affiant knew that fact but failed to disclose it. And the allegation that a sergeant in the Los Angeles County Sheriff's Department earlier had spoken to a sergeant in the Long Beach Police Department gang unit had little if any relevance. Even if there had been some communication between these two agencies, it did not establish that the affiant knew but failed to disclose that Camacho was a suspect in two homicide investigations pending in other jurisdictions.

Sandoval further argues that "the trial court improperly relied on the factual findings it made during the evidentiary hearing on [Camacho's] motion to suppress." The trial court observed that several of the factual allegations made in the supplemental motion to suppress evidence were "statements which Mr. Camacho made during . . . his own motion to try and suppress his statement." The court stated: "My recollection is the court found him to be far less than a credible witness. In fact, most of what he said was absurd." The court ruled: "I don't see how the additional statements that the defense offered would warrant a *Franks* hearing and would be grounds for altering the ruling the court has already given."

Sandoval argues that he "should not have been bound by critical credibility determinations made by the court in a hearing to which he had not been a party." Sandoval forfeited this claim by failing to object on this ground in the trial court. (*People v. Pearson* (2013) 56 Cal.4th 393, 416.) The claim also lacks merit. Sandoval relies on cases discussing judicial notice (*Plumley v. Mockett* (2008) 164 Cal.App.4th 1031, 1050–1051; *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548,

16

1568; *U.S. v. Jones* (11th Cir. 1994) 29 F.3d 1549, 1553) and informing a jury of facts found in a judicial opinion (*U.S. v. Sine* (9th Cir. 2007) 493 F.3d 1021, 1034; *Harmer v. State* (Neb. 1937) 276 N.W. 378, 380 ["a judgment in another case finding a fact now in issue is ordinarily not admissible"].)  In the present case, Sandoval relied upon Camacho's testimony at a hearing over which the trial court judge recently had presided.  He cites no authority stating it was improper for the trial court to rely upon the fact that this testimony had not been credible.

### B.  Death Qualification of Prospective Jurors

Sandoval argues that excusing for cause prospective jurors who indicated they could not consider imposing the death penalty "resulted in impanelment of a jury biased in favor of conviction and imposition of the death penalty," thereby violating "his jury trial right, his right to due process, his right to equal protection, and it inhibited the exercise of his right to be free from cruel and/or unusual punishment."  (Fns. omitted.)  Defendant acknowledges that this court and the United States Supreme Court have considered and rejected this argument (*Lockhart v. McCree* (1986) 476 U.S. 162, 176–177; *People v. Chism* (2014) 58 Cal.4th 1266, 1286) but raises the issue nonetheless "because the death penalty jurisprudence of the courts in this nation is not static but evolving."  He presents no persuasive reason for us to revisit our previous holdings on this point.

### C.  Failure to Read the Indictment to the Jury

Sandoval claims that the judgment must be reversed because the trial court failed to read the indictment to the jury and inform the jury that he had pled not guilty, as required by section 1093.  Section 1093 states in pertinent part:  "The jury having been impaneled and sworn, unless waived, the trial shall proceed in the following order, unless otherwise directed by the court:  [¶] (a) If the accusatory pleading be for a felony, the clerk shall read it, and state the plea of the

17

defendant to the jury, and in cases where it charges a previous conviction, and the defendant has confessed the same, the clerk in reading it shall omit therefrom all that relates to such previous conviction.  In all other cases this formality may be dispensed with."

Before the first panel of prospective jurors was brought into the courtroom, the trial court described how jury selection would be conducted and noted that after his introductory comments he would "have to read the indictment to the panel as well."  The court read the indictment to the first panel of prospective jurors.  It does not appear that the trial court informed the jury that Sandoval had pled not guilty.  The court did not read the indictment to the second panel of prospective jurors but did so for the third panel.  The court did not read the indictment to the fourth, fifth, or sixth panels.  The jury and four alternate jurors were selected and sworn.  The following then took place outside the presence of the jury:

"The Court:  I know I stopped reading the indictment. . . .  Therefore, I have to read it on Monday, unless you don't think it's necessary.

"[Defense Counsel]:  I don't think it's necessary.

"[Prosecutor]:  I don't either.

"The Court:  Fine.  Then I won't.  That's fine with me."

At the beginning of the proceedings the following day, the court instructed the jury, "You must not be biased against the defendant because he has been arrested for this offense, charged with a crime and brought to trial.  None of these circumstances is evidence of guilt, and you must not infer or assume from any or all of them he is more likely to be guilty than not guilty."

We agree with the Attorney General that defense counsel expressly waived any right Sandoval had to have the court read the indictment.  "Section 1093 of the Penal Code expressly authorizes the waiving of the reading of the information and

18

clearly this is a function which lies within the general authority of counsel to perform for the defendant absent any specific requirement in the law that the waiver must be by the defendant personally." (*People v. Herrera* (1962) 209 Cal.App.2d 748, 752.) In his reply brief, Sandoval contends that "[a]ssuming an enforceable waiver with respect to the reading of the indictment, any such waiver did not relieve the court of its duty to inform the jury that Mr. Sandoval had pled not guilty to the charges against him." But because the court's obligation to state a defendant's plea in section 1093 follows on the court's obligation to read the indictment, we find that Sandoval, by agreeing to waive the court's reading of the indictment, likewise waived the court's statement of his plea to the indictment.

### III. GUILT PHASE ISSUES

#### A. Testimony of Gang Expert

Sandoval contends that the trial court invaded the province of the jury by admitting testimony by a gang expert that one reason Sandoval brought the assault weapon was to use it against the police if they arrived during the planned attack on Toro.

Over Sandoval's objection, Sergeant Richard Valdemar testified that gangs "often use military type tactics." When Sandoval and his fellow gang members reached Toro's house, "they would deploy in a group, like a military unit . . . . [T]he long arm or rifle would take a position of advantage that would allow him to cover the people with hand guns who would approach the house, possibly also acting as lookouts on either end of the street . . . ." Gang members "expect there to be a law enforcement presence." Using an assault weapon usually "would out gun the police." If the police arrived, "it would be the back up man's duty to take them on and pin them down or kill them if possible."

19

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." (Evid. Code, § 720, subd. (a).) "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801.)

Sandoval is incorrect in claiming that "the sergeant was no more qualified than the jury to determine whether Mr. Sandoval took part in a premeditated plan to 'take on' any police who interrupted B.P.'s attack on Toro." Sergeant Valdemar qualified as an expert on gang tactics because he had extensive experience with criminal street gangs as a police officer and in the military as a military police officer. And we have held that the subject of gang tactics is sufficiently beyond common experience to be a proper subject of expert testimony. (*People v. Gardeley* (1996) 14 Cal.4th 605, 617.)

Nor did "the sergeant's testimony constitute[] an impermissible opinion as to Mr. Sandoval's guilt on the first degree murder charge," as Sandoval's briefing contends. Sergeant Valdemar did not testify that Sandoval was guilty of murder. He properly testified that one reason for bringing an assault weapon to an action to retaliate against a rival gang leader was to attack the police if they arrived during the planned attack.

### B. The Lying-in-wait Special Circumstance Must Be Reversed

Sandoval contends that the lying-in-wait special circumstance must be reversed. There are two bases for his challenge. First, he contends there was insufficient evidence of lying in wait. Second, he argues that the jury was not properly instructed with CALJIC Nos. 8.83 and 8.83.1 that between two

20

reasonable inferences from circumstantial evidence, the jury must choose the inference pointing to innocence.  We need not decide the first issue because we agree with Sandoval on the second.

The trial court instructed the jury that to find true the lying-in-wait special-circumstance allegation, it must find that the "murder was committed *while* the defendant was lying in wait."  (Italics added.)  This formulation is "slightly different from, and more stringent than," the requirement for lying-in-wait first degree murder "that the murder be perpetrated '*by means of*' lying in wait . . . ."  (*People v. Lewis* (2008) 43 Cal.4th 415, 511, italics added.)  A 2000 ballot measure (Prop. 18) changed the definition of the lying-in-wait special circumstance in section 190.2, subdivision (a)(15) to delete the requirement that the murder be committed "while" the defendant was lying in wait and to instead require only the lesser standard that the defendant must have "intentionally killed the victim *by means of* lying in wait."  (Stats. 1998, ch. 629, § 2, p. 4165, approved by voters as Prop. 18, Primary Elec. (Mar. 7, 2000), italics added.)  This change took effect on March 8, 2000, the month before Detective Black was killed, but the trial court used the former, more stringent language to instruct the jury in this case.  The new language does not make a material difference in this case.

Lying-in-wait murder serves two functions in our criminal law.  First, it is a means of proving first degree murder.  "Lying in wait is the functional equivalent of proof of premeditation, deliberation, and intent to kill."  (*People v. Stanley* (1995) 10 Cal.4th 764, 794–795.)  Proof of lying in wait " 'distinguish[es] those cases in which a defendant acts insidiously from those in which he acts out of rash impulse.  [Citation.]  This period need not continue for any particular length " 'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.' " ' "  (*People v. Mendoza* (2011) 52 Cal.4th 1056,

21

1073.)  Once a sufficient period of watching and waiting is established, together with the other elements of lying-in-wait murder, no further evidence of premeditation and deliberation is required in order to convict the defendant of first degree murder.  (*People v. Thomas* (1953) 41 Cal.2d 470, 474.)

Second, lying in wait is also a special circumstance that fulfills the constitutional mandate that " 'a capital sentencing scheme . . . "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." ' "  (*Romano v. Oklahoma* (1994) 512 U.S. 1, 7.)  We have held that the lying-in-wait special circumstance performs this function because it "has been 'anciently regarded . . . as a particularly heinous and repugnant crime.' "  (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1023.)  A substantial period of watching and waiting is one characteristic that helps distinguish lying-in-wait murder from ordinary murder.  Concealment of purpose is not by itself "sufficient to establish lying in wait" because "many 'routine' murders are accomplished by such means."  (*People v. Morales* (1989) 48 Cal.3d 527, 557.)  But "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage, presents a factual matrix sufficiently distinct from 'ordinary' premeditated murder to justify treating it as a special circumstance."  (*Ibid.*; see *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1183 (*Hajek and Vo*).)

Sandoval contends that the jury should have been instructed with CALJIC Nos. 8.83 or 8.83.1.  CALJIC No. 8.83 (6th ed. 1996) states:  "You are not permitted to find a special circumstance alleged in this case to be true based on circumstantial evidence unless the proved circumstance is not only (1) consistent with the theory that a special circumstance is true, but (2) cannot be reconciled

22

with any other rational conclusion. [¶] Further, each fact which is essential to complete a set of circumstances necessary to establish the truth of a special circumstance must be proved beyond a reasonable doubt. [¶] In other words, before an inference essential to establish a special circumstance may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which that inference necessarily rests must be proved beyond a reasonable doubt. [¶] Also, if the circumstantial evidence is susceptible of two reasonable interpretations, one of which points to the truth of a special circumstance and the other to its untruth, you must adopt the interpretation which points to its untruth, and reject the interpretation which points to its truth. [¶] If, on the other hand, one interpretation of that evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." CALJIC No. 8.83.1 (6th ed. 1996) is essentially the same except it specifically references mental states: "you may not find a special circumstance alleged in this case to be true unless the proved circumstances are not only, (1) consistent with the theory that the defendant had the required [specific intent] [mental state], but (2) cannot be reconciled with any other rational conclusion."

While acknowledging he did not ask the trial court to instruct with CALJIC Nos. 8.83 and 8.83.1, Sandoval contends that the trial court had a sua sponte duty to give at least one of these instructions. The obligation to instruct the jury sua sponte "on general principles of law relevant to the issues raised by the facts of the case before it . . . includes the duty to instruct on the effect to be given circumstantial evidence but only when circumstantial evidence is 'substantially relied on for proof of guilt.' [Citation.] The instruction should not be given 'when the problem of inferring guilt from a pattern of incriminating circumstances is not present.' " (*People v. Wiley* (1976) 18 Cal.3d 162, 174 (*Wiley*).) As the court said

23

in *People v. Bender* (1945) 27 Cal.2d 164, 175 (*Bender*), in explaining why the equivalent instruction should be given sua sponte: " '[T]o justify a conviction, the facts or circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion.' It cannot be too strongly emphasized that such quoted statement enunciates a most important rule governing the use of circumstantial evidence." On the other hand, when the circumstantial evidence is not substantially relied on, giving this kind of instruction may confuse or mislead the jury. (*People v. Anderson* (2001) 25 Cal.4th 543, 582.) Thus, the instruction should not be given, for example, when circumstantial evidence is merely used to corroborate direct evidence. (*Ibid.*; *People v. Wright* (1990) 52 Cal.3d 367, 406.)

Whether the instruction should be given therefore depends on whether the prosecution in this case substantially relied on circumstantial evidence to prove the lying-in-wait special circumstance. The resolution of this question requires us to understand the nature of the prosecution and defense cases with regard to that circumstance. Although Sandoval's attack on Detectives Black and Delfin had many of the hallmarks of murder by means of lying in wait and appeared to the surviving victim and an observer like a classic ambush, Sandoval argued at trial, and now contends, that there was insufficient evidence of a substantial period of watching and waiting for an opportune time to murder the officers.

The prosecutor argued that the period in question was substantial enough because it began the moment Sandoval ducked down behind the car. At that point, according to the prosecution, Sandoval was not merely hiding from the police but contemplating murdering them. As the prosecutor said during closing argument: "He sees the police officer, ducks down, and waits to see whether it's necessary, whether it's appropriate, for him to begin shooting, whether it's going to be necessary to kill the police officers. Depending on their conduct."

24

Sandoval's counsel contested the prosecution's characterization of the facts. He said, "It's not a lying in wait murder of Daryle Black. The hiding behind the car. He was not lying in wait to shoot Daryle Black. He was hiding from him. There was no period of watching and waiting. It was a total surprise."

Sandoval's confession supports, or at least does not contradict, the defense argument that he initially ducked down behind the car to hide from the police and formulated an intention to kill them only when they approached Camacho (Rascal). Sandoval had the following exchange with his chief interrogator, Steve Lasiter:

"SL:   And you're just getting out of the car when you see [the police car.]

"RS:   Yes.

"SL:   What did you do next?

"RS:   I ducked.

"SL:   Okay. You ducked where?

"RS:   Behind.

"SL:   Where did you duck? Or what did you hide behind?

"RS:   Behind the car.

"SL:   All right. As you're hiding behind the car, what do you see?

"RS:    I see the cop car looking at Rascal.

"SL:   Okay. How many officers are in the car?

"RS:   Two.

"SL:   Okay. And can you see them?

"RS:   Yes.

"SL:   Okay. Both of [the police officers] are looking at Rascal?

"RS:   Yes.

"SL:   Okay. And you can see that?

"RS:   Yes.

25

"SL: All right. What happens next?

"RS: Well, I try to save Rascal. So I jumped off.

"SL: Okay. You try to save Rascal from what?

"RS: From not going to jail.

"SL: Why would he go to jail?

"RS: Because he was on parole.

"SL: Okay.

"RS: So I jumped off and started shooting at the officers."

Elsewhere in his confession, Sandoval said that when he first spotted the police car, it was about two houses north of where he was. When he saw the police officers looking at Camacho, the police car was one car length north of him, and that was when he decided to shoot them. Sandoval further said that the car was 10 feet away when he began shooting, though it is not clear whether Sandoval meant 10 feet north or 10 feet east of him. The one eyewitness to testify, Jimmy Falconer, said that he was backing out of his driveway and then stopped backing out as the police car passed. He continued to back up and saw the police car slow down, and "just as they passed me up, gun fire opened up."

From the record, it is difficult to determine the length of time between Sandoval's decision to kill the officers after they approached Camacho and his execution of that decision. The evidence suggests it was extremely short, perhaps a second or two. But Sandoval's confession was not the only evidence relevant to fixing the period of watching and waiting. As recounted above, Sergeant Valdemar, the gang expert witness, opined in response to a hypothetical posed by the prosecutor that in an operation to kill a rival gang leader, those gang members involved in the operation "would deploy in a group, like a military unit . . . . [T]he long arm or rifle would take a position of advantage that would allow him to cover the people with hand guns who would approach the house, possibly also acting as

26

lookouts on either end of the street . . . ." Gang members "expect there to be a law enforcement presence." Using an assault weapon usually "would out gun the police." If the police arrived, "it would be the backup man's duty to take them on and pin them down or kill them if possible."

Thus, the prosecutor's statement that Sandoval "sees the police officer, ducks down, and waits to see whether it's necessary, whether it's appropriate, for him to begin shooting, whether it's going to be necessary to kill the police officers," is unmistakably a reference to Sergeant Valdemar's testimony because that was the principal evidence supporting that supposition. That reference became explicit in the prosecutor's surrebuttal, responding to defense counsel's intertwined arguments that there was no premeditation or lying in wait: The prosecutor told the jury to "[l]isten to what Rich Valdemar said." In summarizing Valdemar's testimony, he told the jury: "This is the way [criminal street gangs] deploy their troops. This is the way they commit these types of crimes. They do consider law enforcement's presence. They do bring long arms in order to fend off police in the apprehension of their fellow gangsters." From this testimony, the jury could infer that when Sandoval ducked behind the car, he was contemplating killing the police.

Sergeant Valdemar's testimony, which was indisputably circumstantial evidence, was thus critical to the prosecutor's case for lying in wait. Although there was evidence that Sandoval was hiding and waiting and watching as soon as the police appeared on Lime Avenue, Sergeant Valdemar's testimony was the principal evidence in support of the prosecution's theory that Sandoval was watching and waiting *for an opportune time to commit the murder* from the moment he spotted the police. Yet Sandoval's confession, though highly incriminating, makes no mention of any thought about killing the police until they approached Camacho. Thus, this case is unlike *People v. McKinnon* (2011) 52

27

Cal.4th 610, 676 fn. 40, where we held that circumstantial evidence that corroborates or bolsters direct evidence does not warrant the circumstantial evidence instruction at issue here, even when a defendant claims the circumstantial evidence was stronger than the direct evidence. In this case, contrary to Justice Chin's view (see conc. & dis. opn., *post*, at p. 10–11), Sergeant Valdemar's testimony did not bolster any direct evidence of the prosecution's theory; it was the crucial evidence used to prove that theory.

We therefore conclude that the prosecution's case for the lying-in-wait special circumstance substantially relied on that circumstantial evidence, and that CALJIC No. 8.83 or No. 8.83.1, or its equivalent, should have been given sua sponte. The trial court's mistake may have been understandable in these circumstances. The lying-in-wait issue was a relatively small part of the prosecutor's case: most of his case focused on establishing first degree premeditated murder and attempted murder, and the prosecution also argued for three other special circumstances and various enhancements. Furthermore, as discussed, the prosecutor's reference to Sergeant Valdemar's testimony was sometimes oblique. Nonetheless, the prosecutor did substantially rely on that circumstantial evidence to prove his theory of the lying-in-wait special circumstance, and CALJIC No. 8.83 or 8.83.1 should have been given.

When a trial court erroneously fails to give this instruction or its equivalent, it may be reversible error. (*Wiley*, *supra*, 18 Cal.3d 162, 174–175; *People v. Yrigoyen* (1955) 45 Cal.2d 46, 49–50; *Bender*, *supra*, 27 Cal.2d at p. 175.) We have not had occasion to specify the standard of prejudice to be applied to such an error. The requirement to give CALJIC No. 8.83 is a rule emerging out of our case law to ensure that the reasonable doubt standard and the burden of proof are properly applied in the context of circumstantial evidence. (See *Bender*, *supra*, at p. 175.) The failure to give the instruction, while a significant omission, does not

affirmatively mislead the jury about the proper standard or burden of proof, and therefore is not structural error requiring automatic reversal. (Cf. *Sullivan v. Louisiana* (1993) 508 U.S. 275, 280–282.) Nor does the failure to give the instruction omit an element of a criminal offense, an error that can only be excused if harmless beyond a reasonable doubt. (Cf. *People v. Gonzales* (2012) 54 Cal.4th 643, 662–663.) The error in this case is more closely analogous to the trial court's failure to give a pinpoint instruction, which is judged as state law error that is prejudicial only where there is a reasonable probability of a more favorable result. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1111–1112; *People v. Watson* (1956) 46 Cal.2d 818, 837.) " 'We have made clear that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*People v. Wilkins* (2013) 56 Cal.4th 333, 351.)

Here we conclude that it is reasonably probable that had the jury been properly instructed, it would not have found the special circumstance true. "We presume that jurors understand and follow the court's instructions." (*People v. Pearson*, *supra*, 56 Cal.4th at p. 414.) One inference from Sergeant Valdemar's testimony is that Sandoval, acting the way gang members typically operate, began to contemplate the murder of the police officers as soon as he saw them and hid behind the car. But this inculpatory inference is not the only reasonable inference that could be drawn from such testimony. A reasonable juror, while believing the gang expert, might have inferred that his testimony about how street gangs *usually* think and act did not prove that Sandoval thought or acted that way in this instance. Such a juror could reasonably refuse to credit the prosecution's theory about what Sandoval was thinking when he first saw the police unless Sergeant Valdemar's testimony was supported by direct evidence of Sandoval's mental state at the time. This view does not posit that the jury "*rejected the circumstantial evidence*" (dis. opn., *post*, at p. 3); it posits only that the jury

29

reasonably rejected the inference that the prosecution wanted it to draw from that evidence.

We further conclude that with Sergeant Valdemar's testimony discounted, there is a reasonable chance the jury would have found the lying-in-wait special circumstance not true. The jury was instructed that lying in wait was defined in part as "a waiting and watching for an opportune time to act" that "need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation and deliberation." As discussed, the prosecutor argued that the period of waiting and watching for an opportune time to act began at the time the officers arrived on Lime Avenue. Sergeant Valdemar's testimony was the principal evidence in support of that theory. Notwithstanding Justice Chin's view of the evidence (see conc. & dis, opn., *post*, at pp. 10–11), it is unlikely that the jury on its own would have arrived at an alternate theory and would have concluded that the very brief, indeterminate time between when Sandoval noticed the police looking at Camacho and when Sandoval opened fire was a sufficiently substantial period of watching and waiting. Whether or not this would have constituted sufficient evidence of lying in wait, there is more than an abstract possibility that, without the benefit of the prosecutor's theory and confronted with an extremely short period of waiting that seems difficult to call waiting at all, the jury would not have found true the lying-in-wait special circumstance.

We therefore reverse the judgment on the lying-in-wait special circumstance. Sandoval does not argue that reversal of that special circumstance requires a reversal of the penalty phase judgment, nor could he plausibly do so. As discussed below, the failure to properly instruct on the role that circumstantial evidence played in proving the lying-in-wait special circumstance does not call into question Sandoval's first degree murder verdict. Moreover, three special-

30

circumstance findings against Sandoval remained, which underscores the particularly heinous nature of the murder:  murder of a peace officer engaged in the lawful performance of his duties, murder committed for the purpose of preventing a lawful arrest, and murder to further the activities of a criminal street gang.  Each of these was proved primarily by the direct evidence of Sandoval's confession.  Furthermore, the jury would still have been statutorily permitted at the penalty phase to consider almost all of the same evidence concerning the facts and circumstances of Black's murder.  (§ 190.3, factor (a); see *Hajek and Vo*, *supra*, 58 Cal.4th at pp. 1186–1187.)  Even if the jury had concluded there was insufficient evidence of watching and waiting to find the lying-in-wait special circumstance true, that conclusion would have done little to alter the highly aggravated nature of Sandoval's murder of Detective Black and attempted murder of Detective Delfin.  Nor would it have changed the jury's assessment of the other aggravating evidence introduced.  We conclude there is no reasonable possibility that the error affected the penalty phase verdict.

## C.  Sufficiency of Evidence of First Degree Murder

Sandoval argues that there was insufficient evidence of first degree murder because his shooting of Detective Black was "intentional but unplanned" and "not premeditated and deliberate."  He argues, as defense counsel did at trial, that there was only sufficient evidence of second degree murder.

In reviewing a challenge to the sufficiency of the evidence, we "review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.  [Citation.]  The record must disclose substantial evidence to support the verdict — i.e., evidence that is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable

doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

We first note that the jury in this case was instructed on two theories of first degree murder: premeditation and deliberation, and lying in wait. When a jury is instructed on two theories of first degree murder, a first degree murder verdict will be upheld if there is insufficient evidence as to one of the theories. (*People v. Lewis* (2008) 43 Cal.4th 415, 507.) We need not decide whether there was sufficient evidence of murder by means of lying in wait because we conclude there was sufficient evidence of premeditation and deliberation. Contrary to Justice Chin's view (see conc. & dis. opn., *post*, at p. 13), a conclusion that there was insufficient evidence of lying-in-wait murder does not mean there was no premeditation and deliberation, but only that these mental states must be established by another route.

The trial court instructed the jury that "murder which is perpetrated by any kind of willful, deliberate and premeditated killing with express malice aforethought is murder of the first degree." "First degree murder, like second degree murder, is the unlawful killing of a human being with malice aforethought, but has the additional elements of willfulness, premeditation, and deliberation which trigger a heightened penalty." (*People v. Chiu* (2014) 59 Cal.4th 155, 166.) " 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold,

32

calculated judgment may be arrived at quickly.' " (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 (*Koontz*).)

"In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27, this court reviewed earlier decisions and developed guidelines to aid reviewing courts in assessing the sufficiency of evidence to sustain findings of premeditation and deliberation. [Citation.] We described three categories of evidence recurring in those cases: planning, motive, and manner of killing. [Citations.] The *Anderson* decision stated: 'Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of [planning] or evidence of [motive] in conjunction with [evidence of] either [planning] or [manner of killing].' (*Anderson*, at p. 27; [citation].) Since *Anderson*, we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 419–420.) In particular, the *Anderson* factors "are not well adapted to a case . . . in which the defendant's post-offense statements provide substantial insight into the defendant's thought processes in the crucial moments before the act of killing." (*People v. Mayfield* (1997) 14 Cal.4th 668, 768 (*Mayfield*).)

In his briefing, Sandoval says he arrived at Lime Avenue intending to kill Toro and had insufficient time to premeditate the murder of Detective Black. But there is ample, uncontradicted direct evidence from Sandoval's own confession and conduct of premeditation and deliberation. First, Sandoval's confession reveals his motive. His decision to kill the police rather than have his fellow gang member returned to prison epitomizes a " ' "cold, calculated judgment . . . arrived at quickly." ' " (*Koontz, supra,* 27 Cal.4th at p. 1080; see *Mayfield, supra,* 14 Cal.4th at p. 767 [quick but "cold and calculated decision" to kill police officer

33

rather than being arrested supports a finding of premeditation].)  Moreover, the manner of killing may be "sufficiently ' "particular and exacting" ' to warrant an inference that defendant was acting according to a preconceived design."  (*People v. Thomas* (1992) 2 Cal.4th 489, 518.)  The fact that the manner of killing is prolonged also supports an inference of deliberation.  (*People v. Davis* (1995) 10 Cal.4th 463, 510.)  Here, the firing of 28 shots from a high-powered weapon into a police car, a period that lasted for about two minutes, according to eyewitness Jimmy Falconer's testimony, provided evidence of a military-style execution of Sandoval's hastily made plan from which the jury could reasonably infer premeditation and deliberation.

On the other hand, there is scant evidence to support Sandoval's theory of second degree murder.  There is little indication that the murder was rash and impulsive, as when a defendant acts out of a fear or passion in response to a provocation that is insufficient to show an absence of malice.  (See *People v. Rogers* (2006) 39 Cal.4th 826, 866–867; *People v. Dewberry* (1959) 51 Cal.2d 548, 553.)  We conclude there was sufficient evidence from which a jury could conclude beyond a reasonable doubt that Sandoval's murder of Detective Black was willful, deliberate, and premeditated, and therefore constituted murder of the first degree.

Sandoval argues that "the prosecutor urged the jury to find premeditation and deliberation pursuant to a transferred premeditation theory."  (See *Hajek and Vo*, *supra*, 58 Cal.4th at p. 1184, fn. 12 [a transferred intent theory of the lying-in-wait special circumstance has "no support in case law"].)  Although the prosecutor argued that "[t]he premeditation and deliberation . . . started a long time before they ever got to Lime [Avenue]," he did not argue that Sandoval's prior intent to kill Toro could be transferred to constitute intent to kill Detective Black.  Rather, the prosecutor argued that when the police car arrived at the scene, Sandoval

34

"chang[ed] his focus from willful, deliberate premeditated killing Toro to now, I'm going to kill these police officers. This defendant considered what the options were and what the appropriate course of action was, and he chose to kill Daryle Black and try and kill his partner." The record does not support Sandoval's claim that the prosecutor urged a transferred premeditation theory.

### D. Refusal to Instruct the Jury with CALJIC No. 2.02

Sandoval argues that the trial court erroneously refused his request to give the jury the standard instruction regarding the use of circumstantial evidence, CALJIC Nos. 2.01 and 2.02, the guilt phase equivalents of the special circumstance instructions CALJIC Nos. 8.83 and 8.83.1, discussed above. Sandoval points out that "[e]vidence of a defendant's state of mind is almost inevitably circumstantial . . . ." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208.) But we have held that this fact alone does not require a trial court to instruct the jury pursuant to CALJIC No. 2.02: "The fact that the elements of a charged offense include mental elements that must necessarily be proved by inferences drawn from circumstantial evidence does not alone require an instruction on the effect to be given such evidence however. The contrary is usually the rule." (*Wiley*, *supra*, 18 Cal.3d at p. 175.) An instruction on the effect to be given circumstantial evidence is not required simply because the defendant's mental state "had to be inferred from the circumstances" of the crime. (*Ibid*.)

Moreover, although we hold above that the equivalent circumstantial evidence instruction should have been given with respect to the lying-in-wait special circumstance, we do not similarly conclude CALJIC No. 2.01 or 2.02 should have been given simply because the jury was instructed on murder by lying in wait. As discussed, this instruction should be given "only when circumstantial evidence is 'substantially relied on for proof of guilt.' " (*Wiley*, *supra*, 18 Cal.3d

35

at p. 174.) Here the prosecutor, when arguing first degree murder to the jury, relied primarily on a theory of premeditation and deliberation, emphasizing Sandoval's confession and the manner of killing. We held in *Wiley* that "[e]xtrajudicial admissions, although hearsay, are not the type of indirect evidence as to which the instructions on circumstantial evidence are applicable." (*Ibid.*)

Even if it were error to refuse the instruction, there is no reasonable probability the instruction would have resulted in a more favorable verdict. The strong direct evidence of premeditation and deliberation recounted above, which the prosecutor focused on, means that even if the jury discounted Sergeant Valdemar's testimony about Sandoval's likely mental state when he initially spotted the police officers on Lime Avenue, there is no reasonable chance it would have returned a second degree rather than first degree murder verdict.

### E. Admission of Camacho's Notes

Sandoval asserts that the trial court erred in admitting into evidence notes written by codefendant Miguel Camacho as he prepared for a gang meeting.

On the afternoon of the day Sandoval shot Detectives Black and Delfin, Camacho and about 30 other members of the Barrio Pobre gang met in a house on Dairy Street. As Camacho was organizing the meeting, he wrote notes on two sheets of white, lined paper. One page has what appears to be 13 gang names followed by telephone numbers. The other sheet lists 33 gang names. In the middle of the page, Camacho wrote what appear to be talking points for the meeting: "Tagers in the neighborhood, no straps, too much hanging out and not enough dead muthaphuckers, homies click tripping, homies doing stupid shit and cause of that other homies pay for it, braging about another homie's dirt or even talking about it." A gang expert testified that "tagers" refers to graffiti and "strap"

36

refers to carrying a gun, so "no straps" means some gang members did not have guns.

Sandoval objected to admission of the notes on the grounds that Camacho's notes were "not connected up with [Sandoval] because there's no showing that [Sandoval] endorsed or watched [Camacho] write it; was there when he talked about it," and the notes are "basically hearsay," and their probative value was outweighed by their prejudicial effect. The court held that "the foundation was laid as to the authenticity of the writing," it was relevant because it listed the people who attended the meeting, it was connected to Sandoval because he attended the meeting, it was very probative and was more probative than prejudicial. The court did not rule on the hearsay objection.

On appeal, Sandoval focuses on the statement in the notes that there was "too much hanging out and not enough dead muthaphuckers." A gang expert testified that this meant "we're acting like a club, not like a gang. We're not killing enough people or our rivals." Sandoval argues that this statement was hearsay because it was offered to prove the truth of the matter stated: "Specifically, the prosecutor offered the written remark to prove Mr. Sandoval's mental state at the time of the shooting of Detective Black."

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) In *People v. Mendoza* (2007) 42 Cal.4th 686, 697, we held that the murder victim's out-of-court accusation that the defendant had sexually molested her was not hearsay because it was not offered "to prove defendant actually molested her, but rather to prove defendant was aware of the accusations and to explain defendant's motive for killing" the victim. We held that the victim's "accusations were properly admitted to explain defendant's state of mind, motive, and conduct." (*Ibid*.) Similarly, Camacho's

37

note was not offered to prove that there actually were not enough dead people or that the gang actually had not killed enough people, but to prove that shortly before defendant shot Detectives Black and Delfin, a leader of his gang had told him that gang members should kill more people. The note was properly admitted to explain Sandoval's state of mind when he shot the officers.

Sandoval also appears to argue that the notes were irrelevant because "[n]o evidence was presented that [Camacho] or any other B.P. member read or otherwise communicated the contents of [Camacho's] notes to other B.P. members at the B.P. meeting . . . ." Evidence was introduced that Camacho prepared these notes as he was organizing a meeting of gang members. The jury reasonably could conclude that these notes reflected what Camacho later said at the meeting.

### F. Evidence of Threats Against Angela Estrada

Sandoval contends the trial court erroneously admitted evidence that prosecution witness Angela Estrada was threatened. Estrada was living at her sister's house on Dairy Street when Sandoval, Camacho, and other members of Barrio Pobre met there just before the April 29, 2000 shooting. During direct examination, the prosecutor asked Estrada whether she had been threatened:

"Q: Have you been threatened with regard to coming in here and telling this jury the truth about what you know?

"The Court: I'm going to admonish the jury right now. Any questions dealing with threats does not infer or assume that those threats are connected with the defendant in any way, but threats in general may have occurred by people on their own who have no ties or relationship with the defendant, and you're not to assume otherwise. Please go ahead.

"[¶] . . . [¶]

"Q: Do you remember the question?

38

"A: Yes.  Have I been threatened?

"Q: Yes.

"A: Not in particular.  But in general, yes.

"Q: What do you mean?  What does that mean?

"A: I've just been told, you know, just to watch what I say.

"Q: Well, what does that mean?

"A: I don't know.

"Q: Was the person with a message that you got a message from someone in Barrio Pobre?

"A: No.

"Q: Did you tell Detective Prell and I when we spoke it was someone in Barrio Pobre?

"A: Look, I don't know what you're trying to get at but - -

"The Court:  Ma'am, just answer the question.

"A: No, it wasn't.

"Q: Did you tell Detective Prell and I, and then Detective Robbins and I, that you were threatened by someone in Barrio Pobre?

"A: Someone told me, you know.  They didn't tell me directly.  Someone had said, you know, we -- we -- we--we saw the paperwork, and you said this and you said that.  That's all that was said."

Estrada later added:

"Q: If there were paperwork indicating that you had testified being a past member of Barrio Pobre, and you had testified against another member of B.P., would that be looked on favorably or unfavorably by people in the neighborhood?

"A: Unfavorably."

A "jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his

39

testimony at the hearing, including but not limited to any of the following:  [¶] . . . [¶] (f) The existence or nonexistence of a bias, interest, or other motive.  [¶] . . . [¶] (j) His attitude toward the action in which he testifies or toward the giving of testimony."  (Evid. Code, § 780.)  "Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and therefore is admissible.  [Citations.]  An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court."  (*People v. Burgener* (2003) 29 Cal.4th 833, 869.)  "Moreover, evidence of a 'third party' threat may bear on the credibility of the witness, whether or not the threat is directly linked to the defendant.  [Citations.]"  (*People v. Mendoza*, *supra*, 52 Cal.4th at p. 1084.)  "It is not necessarily the source of the threat — but its existence — that is relevant to the witness's credibility."  (*Burgener*, *supra*, 29 Cal.4th at p. 870.)  The trial court did not abuse its discretion in admitting evidence that Estrada had been threatened.

The court immediately admonished the jury not to "infer or assume that those threats are connected with the defendant in any way," explaining that "threats in general may have occurred by people on their own who have no ties or relationship with the defendant."  Sandoval argues that this admonition was inadequate because "the court did not instruct the jury to limit its consideration of the evidence to the witness's state of mind."  Because the court instructed the jury not to infer that the threats were connected to Sandoval in any way, there was no reason to believe that the jury would have considered the evidence of threats for any reason other than evaluating the state of mind of the witness.  The trial court's admonition was sufficient.

40

### G. Absence of Defendant from the Proceedings

Sandoval argues that the trial court committed reversible error by discussing with counsel how to respond to a question from the jury during deliberations when he was not present.

After the jury retired to deliberate, the trial court asked whether Sandoval wished to be present if the jury requested that testimony be read back. Sandoval personally waived his right to be present. The court then asked whether both of his attorneys wished to be present if the court was called upon to respond to a question from the jury. Defense counsel agreed that only one attorney, William Ringgold, would be present. Sandoval personally waived his right to have both of his attorneys present. He was not asked if he waived his right to be personally present when the court responded to the jury's question.

On the second full day of deliberations, the jury sent the court a written question regarding the attempted murder charge in count two. The question stated in part: "Pages 54 and 55 of the instructions do not states [*sic*] that this must be a premeditated act. Is my interpretation of the elements right?" The trial court consulted by telephone with the prosecutor and both defense counsel, and they agreed upon the following response, which was sent to the jury: "Whether or not there was premeditation as to count two is a finding you are required to make. Please refer to CALJIC 8.67 at pages 56 and 57." Sandoval does not claim this was error.

Later that morning, the court received a second written question from the jury: "If we find the person guilty of count two attempted murder, but find the attempt not to be premeditated, is this person still guilty of the crime?" The prosecutor and defense counsel, Ringgold, appeared. The trial court asked Ringgold whether he wanted Sandoval to be present, and Ringgold replied: "No. I'll waive his presence." The trial court and both counsel agreed to send the jury

41

the following response:  "Yes."  Near the end of the following court day, the jury returned its verdict.

" 'Broadly stated, a criminal defendant has a right to be personally present at certain pretrial proceedings and at trial under various provisions of law, including the confrontation clause of the Sixth Amendment to the United States Constitution, the due process clause of the Fourteenth Amendment to the United States Constitution, section 15 of article I of the California Constitution, and sections 977 and 1043.  [Citation.]'  [Citations.]  ' "A defendant, however, 'does not have a right to be present at every hearing held in the course of a trial.' " ' " (*People v. Jennings* (2010) 50 Cal.4th 616, 681 (*Jennings*).)  A defendant has a right under the Fourteenth Amendment to be present "at a 'stage . . . that is critical to [the] outcome' and [if] defendant's 'presence would contribute to the fairness of the procedure.' " (*Id*. at pp. 681–682.)

In *Jennings*, the defendant was not present at a discussion in chambers between the trial court and counsel at which they discussed how to respond to a question from the jury during deliberations.  We held "that defendant did not have a constitutional or statutory right to be personally present during the in-chambers discussion regarding how to respond to the jury's question . . . .  The formulation of an appropriate response to this question was a legal matter, and . . . a defendant does not have the right to be personally present during proceedings, held in-chambers and outside of the jury's presence, concerning questions of law." (*Jennings*, *supra*, 50 Cal.4th at p. 682.)

*Jennings* applies here.  The fact that the discussion between the court and counsel about how to respond to the jury's question took place in the courtroom rather than in chambers makes no difference.  The jury was not present, and the discussion involved a legal matter.  Sandoval's presence would not have contributed to the fairness of the proceedings.

42

## IV. PENALTY PHASE ISSUES

### A. Retrial of Penalty Phase

Sandoval claims it was unconstitutional to conduct a second penalty trial after the jury in the first penalty trial was unable to reach a verdict. Citing a "national consensus," he argues that "if the prosecutor does not convince the originally empaneled jury to unanimously vote to impose the death penalty, the federal and state bans on cruel and/or unusual punishment prohibit the prosecutor from seeking to exact that penalty in a second penalty trial." He acknowledges that we considered and rejected this argument in *People v. Taylor* (2010) 48 Cal.4th 574, 633–634, but he "respectfully raises the issue here in order to preserve his right to raise the issue in future proceedings, if necessary." Sandoval presents no persuasive reason for us to revisit this issue. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 311.)

### B. Removal of Prospective Juror for Cause

Sandoval argues that the trial court erred in removing for cause Prospective Juror D.M. during jury selection for the second penalty trial.

"[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' . . . [T]his standard . . . does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. . . . [M]any veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death

43

sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror." (*Wainwright v. Witt* (1985) 469 U.S. 412, 424–426, fns. omitted.)

In the present case, D.M. filled out a lengthy juror questionnaire that asked about his views on the death penalty. D.M. indicated he was "for" the death penalty "in some cases." He said he would be able to vote for the death penalty if the evidence showed that penalty was appropriate. But when asked, "Do you realistically see yourself as a person capable of returning a verdict of death on another human being?" D.M. circled the answer "Don't know." D.M. also circled "No" in response to the question, "If you had a choice, would you want to be a juror on this case?"

During individual voir dire, the prosecutor asked D.M. whether he saw himself as a person who could return a death verdict if it was warranted. D.M. said, "I thought about it. And I honestly couldn't answer you. I've never been in that situation before." The prosecutor again asked whether D.M. could return a death verdict if he believed if was warranted, and D.M. answered, "I think so. I really don't know until I face that situation."

When defense counsel asked whether D.M. could vote either for death or for life without parole, D.M. replied, "To be honest, I'm not sure," adding, "I think whether, perhaps I should even have the ability or the power to decide life or death." D.M. said, "I'm not sure whether – I don't know. I'm not sure whether I'm up to the responsibility, to be honest." When asked again whether he could vote for death if he thought it was appropriate, D.M. said, "To be honest, I could only say yes until I was at that actual point."

44

D.M. agreed with defense counsel that what was bothering him was that deciding whether to impose the death penalty was "a pretty momentous and difficult decision." When defense counsel asked whether D.M. was "able to make decisions in your life, even tough ones," D.M. replied, "Not very well."

When the prosecutor asked the court to dismiss D.M. "based on his ambivalence," the court replied, "I think so too. I think he's too ambivalent . . . . I don't think he can make any decision." The court dismissed D.M., saying "he had a problem with just this kind of decision, that this isn't the kind of decision that one should be forced to even make."

The trial court did not dismiss D.M. because he was biased either for or against the death penalty, but because the court concluded that D.M. would be unable to make a decision either way. A prospective juror who is unable to reach a decision is unable to perform the duties of a juror and may be removed for cause. "At bottom, capital jurors must be willing and able to follow the law, weigh the sentencing factors, and choose the appropriate penalty in the particular case. [Citations.]" (*People v. DePriest* (2007) 42 Cal.4th 1, 20.) In determining whether D.M. was unable to fulfill the role of a juror, we accord deference to the trial court. (See *Uttecht v. Brown* (2007) 551 U.S. 1, 9 ["the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts"]; *People v. DePriest*, *supra*, at p. 21 ["The trial court is in the unique position of assessing demeanor, tone, and credibility firsthand—factors of 'critical importance in assessing the attitude and qualifications of potential jurors.' "].)

We reject Sandoval's argument that the trial court erroneously "applied a double standard" because it denied his motion to remove for cause three prospective jurors who favored the death penalty. When asked whether she could be fair and impartial, one such juror answered, "I think so. I don't know."

45

Another prospective juror said she was "really leaning . . . toward the death penalty" because Sandoval had killed a police officer, but assured the court she would take into account all the evidence before reaching a decision. Similarly, the third prospective juror indicated he was "predisposed to the death penalty in the case of the death of an officer" but would listen to evidence of Sandoval's background before making a decision. None of these three prospective jurors indicated, as D.M. did, that they would not be able to reach a decision.

In sum, the record before us supports the trial court's ruling that D.M. could not perform the functions of a juror because he was "too ambivalent" to "make any decision." The trial court did not err in excusing D.M. for cause.

### C. Use of Profanity by Detective Delfin

Sandoval contends that the trial court erred in failing to declare a mistrial after Detective Delfin called Sandoval a "son of a bitch" during his testimony in the penalty phase retrial.

The prosecutor called Detective Delfin as a witness at the penalty retrial, and the detective recounted in moment-by-moment detail what happened when Sandoval opened fire with his assault rifle on the police vehicle Detective Delfin was driving. Detective Delfin heard what he recognized as a shot from an assault weapon and "noticed that it became extremely hot like someone opened up a pizza oven. It was hot. And the car was getting filled with gunfire. [¶] I heard glass breaking. . . . [I]t was like I was in a tornado. The car inside just started exploding everywhere. There was debris flying, glass, fragments. . . . I got shot on the right side of my head, and it knocked me senseless. I lost my motor skills. . . . Pain. From a one to ten scale, a ten. Excruciating pain."

Detective Delfin noticed that Detective Black was not moving and made no sound. He assumed he had been shot. Detective Delfin then was shot in his right

46

knee, which again caused excruciating pain.  The following colloquy then took place.

"[The Prosecutor]  When you say the bullet hit you in the knee, what did it do?

"[Detective Delfin]  It shattered my whole knee.  It shattered the bones. . . . And the bullet exited in the right inner portion of my leg and tore all the muscle out too.

"Q  And as a result of that gunshot, do you have a knee anymore?

"A  No, sir.

"Q  What do you have instead?

"A  I have a prosthetic knee.

"Q  Does the injury which was caused by this person who chose to fire an assault weapon into your vehicle, has it altered your ability to pursue your career as a gang detective?

"A  Yes.

"Q  In what way?

"A  I'm no longer able to work the streets.  The citizens of Long Beach no longer have an officer who cares as much as I do anymore because this son of a bitch shot me, man."

The trial court interrupted, sent the jury to the jury room, and called a recess.  Outside the presence of the jury, the trial court denied Sandoval's motion to dismiss the penalty phase and declare a mistrial, ruling that a jury instruction would be sufficient to cure any prejudice.  When the jurors returned, the court admonished them "to disregard the profanity that was used in characterizing the defendant by this witness."

Citing *Parker v. Gladden* (1966) 385 U.S. 363, Sandoval argues that Detective Delfin's comment was inherently prejudicial because he is a state

47

official. *Parker* is distinguishable. The court bailiff in *Parker* told some of the jurors during deliberations that the defendant was a " 'wicked fellow' " who was " 'guilty' " and later added, " 'If there is anything wrong [in finding petitioner guilty] the Supreme Court will correct it.' " (*Id*. at pp. 363-364.) The high court held that the bailiff's comments violated the defendant's Sixth Amendment rights because " 'the "evidence developed" against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.' " (*Id*. at p. 364.) Here, by contrast, Detective Delfin was testifying as a witness and was subject to cross-examination. His use of profanity was a momentary breach of decorum that was swiftly and adequately addressed by the trial court.

### D. Juror Misconduct

Sandoval argues that two alternate jurors engaged in misconduct by discussing the case prior to deliberations.

After the jury had been excused for the day following Detective Delfin's testimony, Juror No. 11 told the court clerk that he had overheard two alternate jurors discussing the case during a break in the jury room. The court notified counsel and, the next morning, ordered Juror No. 11 to appear outside the presence of the other jurors. Juror No. 11 said that during the previous day, when the jury was in the jury room following Detective Delfin's use of profanity, one alternate juror whispered to another alternate juror, asking what the detective had said; "the response was the curse word." The alternate juror then said, "I can't believe this is happening. I think that it's not even. The consensus is probably seven to five still. I don't know what these people are thinking."

After the juror had left the courtroom, the trial judge remarked that this indicated to her "that somebody has read one of the newspaper articles, because

48

that information was in one of the newspaper articles the other day that the prior jury had hung seven to five." Both the prosecutor and defense counsel added that this information also had appeared in earlier newspaper articles.

The court also examined three jurors who were seated near the alternate jurors. Two had heard nothing, and the third believed that the alternate jurors had been discussing the case because "they were saying like 'he,' 'him' and whispering," but he could not recall what they had said. The two alternate jurors were examined. One denied having discussed the case. The other also denied having discussed the case, but "vaguely" recalled asking someone whether Detective Delfin had said the phrase "son of a bitch." The court then examined each of the remaining jurors individually; each denied hearing any conversation. The trial court denied Sandoval's motions "for dismissal of the penalty" or for a mistrial and to excuse the two alternate jurors, finding that no misconduct occurred. Although the court observed that there was "very conflicting testimony," it seemed to accept the testimony of Juror No. 11, stating that the alternate juror's purported comments were "all statements which have nothing to do with the evidence in the case. But statements dealing with his state of mind, which they're not forbidden to have."

As required by Penal Code section 1122, subdivision (b), the trial court instructed the jurors at the end of each court day that they were not to "converse among themselves . . . on any subject connected with the trial, or to form or express any opinion about the case until the cause is finally submitted to them."

We agree with Sandoval that it was misconduct for the alternate juror to ask another alternate juror whether Detective Delfin had used the phrase "son of a bitch, " as well as for the alternate juror to express disbelief that the jury appeared split on whether to impose the death penalty. These comments, which violated the

49

trial court's instruction not to discuss the case before deliberations, constituted misconduct. We must examine whether the misconduct was prejudicial.

Juror "misconduct raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted." (*People v. Cooper* (1991) 53 Cal.3d 771, 835.) We find that the presumption of prejudice was rebutted in this case. The alternate juror's question with respect to Detective Delfin's statement was a trivial and inconsequential breach of the trial court's instruction. The alternate juror's expression of disbelief that the jury appeared split, while more serious, was brief and isolated. It was heard only by one other juror and was not repeated. (See *People v. Manibusan* (2013) 58 Cal.4th 40, 59 [juror's comments on the defendant's failure to testify were not prejudicial because they were "merely brief and passing observations"]; *People v. Avila* (2009) 46 Cal.4th 680, 727 [jurors' discussion of the defendant's failure to testify was not prejudicial because it "was not of any length or significance"].) And the described conversation was between two alternate jurors, neither of whom participated in deliberations.

### E. Admission of Uncharged Shooting

Sandoval contends that the prosecutor committed misconduct by supplying the jury with a portion of Sandoval's confession in which he admitted shooting another person with the weapon he used to shoot Detectives Black and Delfin, and that defense counsel was ineffective in failing to move for a mistrial when this error was discovered.

Three days after the crime, police executed a search warrant for Sandoval's residence. The AR-15 assault weapon that Sandoval had used to shoot the victims was found covered by a towel behind the stove. After being arrested, Sandoval made a tape-recorded confession in which he admitted unloading the assault

50

weapon and placing it behind the stove. He also admitted that he previously had fired the weapon. A 55-page transcript of the confession was prepared.

Before the recording of his confession was played for the jury at the guilt phase, Sandoval moved to exclude two lines from the tape and transcript in which Detective Lassiter asked whether Sandoval had ever shot anyone else with the assault weapon and Sandoval answered, "Yes, I have." The prosecutor agreed to remove those lines from the transcript and not play that portion of the tape for the jury.

During the penalty phase retrial, just before the tape recording of Sandoval's confession was played for the jury, the prosecutor gave the jurors copies of the transcript. While the tape was being played for the jury, defense counsel interrupted and asked to approach the bench. He noted that Sandoval's statement that he had shot someone else with the murder weapon appeared in the transcript given to the jury. The bailiff collected the copies of the transcript from the jurors, and the trial court instructed the jurors that "there is absolutely no evidence the defendant ever shot anyone else with the CAR-15, and you're ordered to disregard the statements to that effect." Those lines were deleted from the original transcript that was later provided to the jury. The remainder of the tape recording then was played for the jury.

We reject Sandoval's claim that the prosecutor committed misconduct by including the excluded question and answer in the transcript. "In general, a prosecutor commits misconduct by the use of deceptive or reprehensible methods to persuade either the court or the jury. [Citations.] But the defendant need not show that the prosecutor acted in bad faith or with appreciation for the wrongfulness of the conduct, nor is a claim of prosecutorial misconduct defeated by a showing of the prosecutor's subjective good faith." (*People v. Price* (1991) 1 Cal.4th 324, 447.) Here, the prosecutor made a mistake that was quickly caught

51

and corrected. The erroneous transcripts were taken from the jurors, and the trial court gave a clear admonition to cure any harm.

Nor was defense counsel ineffective in failing to move for a mistrial because the prosecutor's error did not warrant declaring a mistrial. The potential for prejudice was not great. The jury was erroneously told that Sandoval admitted he had used the murder weapon to shoot someone else, but the jury already knew that he had used the murder weapon to kill Detective Black and wound Detective Delfin. And the jury knew that Sandoval had used an assault rifle to kill Jesus Cervantez and attempt to kill Steve Romero. Sandoval's admission that he had used the murder weapon to shoot someone else could not have affected the outcome of the penalty phase, and the trial court's timely admonition was sufficient to cure any harm.

### F. Improper Prosecutorial Argument

Sandoval claims that the prosecutor committed misconduct by arguing that Sandoval had grown out his hair to deceive the jury and by anticipating several arguments he expected defense counsel to make.

During his argument at the penalty retrial, the prosecutor invited the jury to consider a videotape taken just prior to the shooting, saying:

"[Prosecutor]: . . . Because that's the person that was on Lime Avenue. That's the person that went to McDonald's; not the guy that started growing his hair out two months ago to deceive you, because that's why he did it. He doesn't have his hair this way, and it won't be this way for 15 minutes after your verdict.

"[Defense Counsel]: I object. That's improper argument.

"The Court: Overruled.

"[Prosecutor]: He began growing his hair out to deceive you. He began doing it when he knew this case was coming to trial. That's why he did it.

52

"[Defense Counsel]:  There's no evidence of this, your Honor.

"The Court:  Counsel may argue inferences from the evidence.  Overruled."

The trial court did not err.  " 'It is settled that a prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.  [Citations.]' " (*People v. Wharton* (1991) 53 Cal.3d 522, 567.)  We have held that a prosecutor's argument that the defendant had deliberately altered his appearance between the time of the murder and the time of trial "was not improper, because it related to the issues of identity and consciousness of guilt." (*People v. Cunningham* (2001) 25 Cal.4th 926, 1001; see *People v. Foster* (2010) 50 Cal.4th 1301, 1355 ["It is not improper for a prosecutor to suggest that a defendant deliberately altered his or her appearance to raise doubt concerning the defendant's identity as the perpetrator . . . ."].)

Nor did the prosecutor commit misconduct by anticipating arguments that the jury was "likely to hear from defense counsel."  The prosecutor predicted that defense counsel would use a triangle to symbolize the population as a whole and argue that only the "infinitesimal portion" of people at the tip of the triangle should get the death penalty.  The prosecutor also argued that defense counsel would claim that a sentence of life without the possibility of parole was sufficient because Sandoval would still be in prison 30 years from now.  Defense counsel objected only when the prosecutor added that if defendant were sentenced to life without parole "Thirty years from now he would still have access to all the quality of life that exists within the prison community; watching television," stating, "Objection.  There's no evidence of this, your Honor."

Defendant is precluded from arguing on appeal that the prosecutor committed misconduct by anticipating arguments defense counsel would raise "because he failed to timely object and request the jury be admonished."

53

[Citations.]" (*People v. Wharton, supra*, 53 Cal.3d at p. 566.) In any event, the prosecutor's argument was proper. There is no misconduct "where the prosecutor anticipates the flaws likely to appear in counsel's closing argument based upon evidence that was introduced." (*People v. Bemore* (2000) 22 Cal.4th 809, 846, citing *People v. Thompson* (1988) 45 Cal.3d 86, 113 (*Thompson*).)

## G. Prosecutorial Misconduct During Argument

Sandoval contends that the prosecutor committed misconduct during his argument in the penalty phase retrial by showing the jury a photo montage of the victims accompanied by music.

At the end of the prosecutor's argument, he played a nearly six-minute PowerPoint presentation that consisted of still photos introduced into evidence accompanied by stirring orchestral music. The photos depicted each phase of Detective Black's life, from infancy until his death, culminating with photos of his lethal wounds and dead body. There were numerous photos of his funeral, which included full honors and was attended by thousands of uniformed officers. Detective Delfin was shown both before and after his injury, as was Maria Cervantes and a photo of the blood-soaked bed in which she was shot. Several photos showed Sandoval flashing gang signs. The presentation also showed the murder weapon and the bullet-ridden, bloodstained car that Detectives Black and Delfin were in when they were shot. Following the presentation, defense counsel stated without contradiction, outside the presence of the jury, that "[d]uring the playing of the video, [juror] number 12, number 7, number 3, and at the end, number 11 began to openly cry." When the court said it did not see Juror No. 11, the clerk interjected, "Yes, including number 11 began to."

Our case law holds that the use of audio-visual presentations dramatizing the life and death of the victims, though not categorically prohibited, risks

54

injecting an improper degree of emotion into the proceedings.  "Courts must exercise great caution in permitting the prosecution to present victim-impact evidence in the form of a lengthy videotaped or filmed tribute to the victim. Particularly if the presentation lasts beyond a few moments, or emphasizes the childhood of an adult victim, or is accompanied by stirring music, the medium itself may assist in creating an emotional impact upon the jury that goes beyond what the jury might experience by viewing still photographs of the victim or listening to the victim's bereaved parents. . . .  In order to combat this strong possibility, courts must strictly analyze evidence of this type and, if such evidence is admitted, courts must monitor the jurors' reactions to ensure that the proceedings do not become injected with a legally impermissible level of emotion."  (*People v. Prince* (2007) 40 Cal.4th 1179, 1289 (*Prince*); see *People v. Vines* (2011) 51 Cal.4th 830, 887 (*Vines*) ["courts should be cautious about admitting videotapes featuring the victim"].)

*Prince* upheld the admission of a 25-minute interview with the victim conducted at a local television station.  We were careful to note the unemotional nature of the evidence:  "[T]he videotaped interview of [the victim] did not constitute an emotional memorial tribute to the victim.  There was no music, emotional or otherwise.  The tape did not . . . display the victim in her home or with her family, nor were there images of the victim as an infant or young child. The setting was a neutral television studio, where an interviewer politely asked questions concerning the victim's accomplishments on the stage and as a musician and the difficulty she experienced in balancing her many commitments, touching only briefly upon her plan to attend college in the fall and follow the stage as a profession. . . . The loss of such a talented and accomplished person is poignant even for a stranger to contemplate, but the straightforward, dry interview depicted

55

on the videotaped recording was not of the nature to stir strong emotions that might overcome the restraints of reason." (*Prince*, *supra*, 40 Cal.4th at p. 1290.)

In *People v. Dykes* (2009) 46 Cal.4th 731, we found no error in presenting an eight-minute video of a murder victim and his family "preparing for and enjoying a trip to Disneyland." (*Id.* at p. 783.) The trial court had deleted the audio portion of the tape and cautioned the prosecutor that commentary during the showing of the tape "should be unemotional." (*Id.* at p. 784.) We held: "The videotape is an awkwardly shot 'home movie' depicting moments shared by [the victim] with his family shortly before he was murdered. The videotape does not constitute a memorial, tribute, or eulogy; it does not contain staged or contrived elements, music, visual techniques designed to generate emotion, or background narration; it does not convey any sense of outrage or call for vengeance or sympathy; it lasts only eight minutes and is entirely devoid of drama; and it is factual and depicts real events." (*Id.* at p. 785.)

A three-minute videotape "of fewer than 20 still photographs" of the victim was properly admitted in *People v. Bramit* (2009) 46 Cal.4th 1221 because it "was not unduly emotional" and was "unenhanced by any soundtrack or commentary." (*Id.* at pp. 1240–1241.) And in *Vines*, we upheld the admission of a five-minute " 'home movie' " of the victim singing and dancing, noting that there was no "added music" and "it is not a tribute or eulogy, and there is nothing particularly dramatic or emotional about the performances." (*Vines*, *supra*, 51 Cal.4th at p. 888.) We agreed with the trial court "that the videotape contained 'nothing inflammatory that would divert the jury from [its] proper function,' and nothing in the record suggests the jury in fact reacted emotionally to the playing of the videotape. We therefore conclude[d] the trial court did not abuse its discretion in admitting it." (*Ibid.*)

56

The presentation in this case was markedly different.  The photographs were accompanied by stirring, emotional music.  In *People v. Kelly* (2007) 42 Cal.4th 763 (*Kelly*), we said:  "Nonfactual dramatization of the evidence in a videotape — in the sense of making a presentation in a dramatic manner — adds irrelevant factors to the videotape.  The videotape must factually and realistically portray the victim's life and character and not present a 'staged and contrived presentation . . . .'  [Citation.]  Trial courts must not permit irrelevant background music or video techniques that enhance the emotion of the factual presentation.  Moreover, the videotape, even when presented factually, must not be unduly emotional.  [Citation.]" (*Kelly*, *supra*, 42 Cal.4th at p. 798; see *People v. Verdugo* (2010) 50 Cal.4th 263, 299; *People v. Zamudio*, *supra*, 43 Cal.4th at p. 367.)  The music accompanying the photos did not serve "to remind the jury that the person whose life was taken as a unique human being"; it instead appeared designed to "inflame [the jury's] passions more than did the facts of the crime." (*Payne v. Tennessee* (1991) 501 U.S. 808, 831, 832 (conc. opn. of O'Connor, J.).)  The photos themselves had been admitted into evidence, and the prosecutor could properly have shown them to the jury during his argument.  But the trial court abused its discretion in allowing the prosecutor to present these images with music designed to amplify their emotional impact.  We hold that because background music in victim impact presentations provides no relevant information and is potentially prejudicial, it is never permitted.  Music in such presentations is permissible only when it is relevant to the jury's penalty phase decision.  (See, e.g., *Vines*, *supra*, 51 Cal.4th at p. 888.)

However, we find "no reasonable possibility" that the jury would have reached a different penalty verdict if the stirring music had been omitted from the PowerPoint presentation.  (*Kelly*, *supra*, 42 Cal.4th at p. 799.)  The presentation came at the end of the four-day penalty trial, during which the evidence focused

57

on the highly aggravated circumstances of the crime.  The fact that Sandoval, using an assault weapon, had fired 28 rounds into a police car, killing one officer in the line of duty and attempting to kill another, undoubtedly had a considerable impact on the jury.  This impact was amplified by evidence properly admitted from Detective Black's friends and siblings and from Detective Delfin and his wife about the impact of the shooting.  Further, as noted, the photographs of Sandoval and his victims in the PowerPoint presentation had been properly admitted.  And the jury was also presented with serious aggravating evidence apart from the circumstances of the crime, i.e., that Sandoval had used an assault weapon to kill Jesus Cervantez and attempt to kill Steve Romero.  It is true that Sandoval was 18 years old at the time he committed the capital offense, that the defense offered several witnesses on his behalf at the penalty retrial, and that the first penalty phase jury did not return a death verdict.  But we find no reasonable possibility, in light of the aggravating evidence presented to the jury, that omitting the music in the PowerPoint presentation would have resulted in a different penalty verdict.

### H.  Instruction about Life Sentence

Sandoval claims that the trial court erred in not permitting defense counsel to tell the jury during argument that a sentence of life without the possibility of parole would mean that he would never be released from prison.

Defense counsel argued to the jury that a sentence of life without the possibility of parole "means that you will never get out."  The prosecutor objected. Outside the hearing of the jury, the court explained that "the correct statement of the law is that you are to assume that it means that."  Defense counsel asked the court "to admonish them now," and the court told the jury:  "Life without the possibility of parole . . . you are to assume that it means that."  Defense counsel

58

added, "you are to assume that that's what it means because that's what it does mean. It means that Ramon Sandoval will spend the rest of his life in a California maximum security prison." The court interrupted:

"The Court: Excuse me. The jury is not allowed to accept the statement that life without the possibility of parole means exactly what it is. You're to assume that that's what it means. Thank you.

"[Defense Counsel]: Well, okay. You're to assume that Ramon Sandoval will spend the rest of his life in a California maximum security prison. Even if he lives to be 100 years old, you're to assume that's where he's going to die."

As a preliminary matter, we reject the Attorney General's contention that because Sandoval's counsel requested the court to admonish the jury that they are to *assume* that life without possibility of parole means what it says, Sandoval forfeited the right to contest that admonition on appeal. Counsel requested that instruction only after the court informed him that it was improper to tell the jury that someone sentenced to life imprisonment without possibility of parole "will never get out." Sandoval has not forfeited his claim that the trial court erroneously prevented him making that argument to the jury.

We also conclude that the trial court erred in not allowing counsel to argue the finality of life imprisonment without parole. To be sure, we have held in the context of jury instructions that it is "incorrect to tell the jury the penalty of death or life without possibility of parole will inexorably be carried out." (*Thompson*, *supra*, 45 Cal.3d at p. 130.) *Thompson* explained that such an instruction "is not accurate" in part because it "ignores the Governor's power of commutation." (*Ibid.*; see *People v. Arias* (1996) 13 Cal.4th 92, 172 [instructing jury that a defendant sentenced to life without possibility of parole " 'will spend the rest of his life confined in state prison' " would be "inaccurate" because "[t]he Governor may ameliorate any sentence by use of the commutation or pardon power"].) But

59

in *Thompson* we distinguished between jury instructions and remarks made during voir dire. "In general, impressing the jury with the weight of its responsibility is beneficial. Hence it was not necessarily error to suggest to them on voir dire that the sentence they decide on will be carried out. At the stage of formal instruction to the jury at the penalty phase, however, the effect of the inaccuracy in this instruction is hard to predict." (*Thompson*, at p. 131, fn. omitted.) *Thompson* extended this logic to counsel's closing argument: "Defense counsel's remarks to the jury during closing argument as to what life without possibility of parole would really mean and what an unending punishment it would be were also within the scope of legitimate argument to the extent the remarks impressed on the jury the gravity of its task." (*Id.* at p. 131, fn. 29.)

We have since disapproved of instructing a penalty phase jury to " 'assume' " that its sentence will be carried out. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 206 (*Letner and Tobin*).) Instead, we have concluded that if an instruction on this subject is given, it should simply admonish the jury to refrain from speculating on matters beyond the evidence and the trial court's instructions. (*Ibid.*) But we have not revised the distinction recognized in *Thompson* between trial court instruction on this topic and statements made during voir dire or closing argument. Defense counsel is permitted to argue that life without possibility of parole is an "unending punishment" to impress upon the jury the "gravity of its task" — that it is choosing between the two harshest punishments available under the law. (*Thompson*, *supra*, 45 Cal.3d at p. 131, fn. 29.) In this particular context, counsel is permitted to argue that the sentence of imprisonment for life without the possibility of parole means the defendant will not be released from prison — a legally accurate description of the sentence — without reference to the speculative factual possibility that the sentence may not be carried out. Claiming that *Thompson* should not be followed, Justice Chin cites

60

*People v. Smith* (2003) 30 Cal.4th 581, 636, where we noted without explanation that defense counsel's statement that the defendant will "never have a parole hearing" was inaccurate.  But we went on to note that both sides in that case argued without objection that if spared execution, the defendant would die in prison; as a result, "[t]he jury understood the significance of its choices."  (*Ibid.*)  We are unpersuaded that *Smith* eclipses the rule set forth in *Thompson* that we follow today.

We therefore turn to the question of whether the error was harmless.  We first note that the Attorney General has not argued harmless error, which complicates our task.  We are bound by article VI, section 13 of the California Constitution, which says:  "No judgment shall be set aside, or new trial granted, in any cause, on the ground of misdirection of the jury, or of the improper admission or rejection of evidence, or for any error as to any matter of pleading, or for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."  The plain meaning of this provision is that a reviewing court may not reverse a judgment without addressing harmless error.  But "as a general rule, '[o]ur adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.' "  (*Greenlaw v. United States* (2008) 554 U.S. 237, 244; see also *Carducci v. Regan* (D.C. Cir. 1983) 714 F.2d 171, 177 (Scalia, J.) ["The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."].)  Courts in other jurisdictions have warned of "the dangers of allowing sua sponte consideration of harmlessness," including "the potential burden on reviewing courts of searching the record without guidance from the parties and

encouragement of sloppy practice by lawyers." (*Gover v. Perry* (6th Cir. 2012) 698 F.3d 295, 300.) Furthermore, courts have warned that "[t]he practice may unfairly tilt the scales of justice by authorizing courts to construct the government's best arguments for it without providing the defendant with a chance to respond." (*U.S. v. Gonzalez-Flores* (9th Cir. 2005) 418 F.3d 1093, 1101.)

When the government has made no case for harmless error, some federal authorities have held that a reviewing court has discretion whether to conduct a harmless error inquiry and that the exercise of such discretion to find an error harmless requires "a double level of certainty: we must be convinced that the error was 'harmless beyond a reasonable doubt' and that 'satisfaction of that standard is beyond serious debate.' " (*U.S. v. Brooks* (9th Cir. 2014) 772 F.3d 1161, 1171.) Under article VI, section 13 of the California Constitution, we do not have discretion to reverse a judgment without first conducting harmless error review. But even if we were to ask, in light of the government's failure to argue harmless error, whether it is beyond serious debate that the error was harmless under *Chapman*, we would conclude that it was in this case. An instruction about a sentence of life without possibility of parole that, although imperfect, does not misinform the jury will generally not be the basis for a reversal in the absence of evidence of juror confusion or concern about the subject. (See *Letner and Tobin*, *supra*, 50 Cal.4th at pp. 206–207.) We find no such evidence on this record. Moreover, it is highly doubtful the jury would draw a prejudicial implication from the trial court's fine distinction between "accepting" and "assuming" that a sentence of life without possibility of parole will be carried out. We therefore perceive no prejudice either from the trial court's ruling preventing Sandoval's counsel from arguing that his sentence "means that you will never get out" or from its admonition to "assume" the same.

### I. Instruction that Jurors Need Not Agree

Sandoval argues that the trial court erred in refusing his request to instruct the jury that "[t]he jurors need not unanimously agree on whether a particular mitigating circumstance is present." Sandoval requested the following jury instruction: "A mitigating circumstance does not have to be proved beyond a reasonable doubt to exist. The jurors need not unanimously agree on whether a particular mitigating circumstance is present. Each juror, in his or her own individual assessment of the evidence, may find that a mitigating factor exists if he or she finds there is any substantial evidence to support it." The trial court refused to give the requested instruction because "it's covered by the other instructions."

The trial court did not err. "We repeatedly have held the trial court does not have to instruct the penalty phase jury that . . . a juror may find that a mitigating circumstance exists if there is any substantial evidence to support it, [or that] . . . there is no requirement that all jurors agree on any factor in mitigation . . . ." (*People v. Lee* (2011) 51 Cal.4th 620, 655.) "The trial court is not required to instruct that mitigating factors need not be proven beyond a reasonable doubt . . . ." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 458.)

### J. Harmless Error

Sandoval claims that a reviewing court may not conclude that any error committed during the penalty phase is harmless. As noted, the California Constitution prohibits a judgment from being set aside unless "the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) Pursuant to this mandate, we have regularly employed harmless error analysis in deciding whether a death verdict should be affirmed (see, e.g., *People v. Cowan* (2010) 50 Cal.4th 401, 491; *People v. Gonzalez* (2006) 38 Cal.4th 932, 960–961; *People v. Ashmus* (1991) 54 Cal.3d 932, 990; *People v. Brown* (1988) 46 Cal.3d 432, 448), and we see no persuasive reason to discard our precedent in

63

favor of a categorical bar on harmless error analysis with respect to penalty phase error.

### K.  Validity of Death Penalty Statutes

Sandoval contends that the death penalty "cannot be administered in a constitutional manner" but recognizes that this court "has repeatedly rejected challenges to the constitutionality of the death penalty."  He raises this challenge "to preserve his right to litigate the issue in further proceedings if necessary." Sandoval has offered no persuasive reason to revisit our precedent holding that California's death penalty law is constitutional.  (*People v. Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at pp. 468–469.)

## CONCLUSION

The judgment with respect to the lying-in-wait special circumstance is reversed. In all other respects, the judgment is affirmed.

**LIU, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CUÉLLAR, J.**
**KRUGER, J**

**CONCURRING AND DISSENTING OPINION BY CHIN, J.**


Although I concur in the judgment affirming defendant's convictions, enhancements, and sentence, for reasons explained below, I do not agree that we should vacate the lying-in-wait special circumstance. Nor do I agree that the trial court erred in precluding defense counsel from making erroneous and inaccurate statements to the jury regarding a sentence of life without possibility of parole, i.e., that the sentence "means that you will never get out" and that defendant "will spend the rest of his life in a California maximum security prison." I also do not subscribe to the majority's suggestion that the approach of some federal authorities to harmless error review when the government fails to make a harmless error argument may be applicable to California appellate courts. The parties have not briefed, or even mentioned, this question, no doubt because the majority's suggestion is so clearly at odds with the California Constitution's express commands regarding the review duty of California appellate courts.

### 1. Lying in Wait

One of the special circumstances the jury found true is that defendant "intentionally killed the victim by means of lying in wait." (Pen. Code, § 190.2, subd. (a)(15).) Defendant argues that, for two reasons, we should set aside this finding: (1) the evidence to establish it is insufficient; and (2) the trial court prejudicially erred in failing to give, sua sponte, an instruction on evaluating

circumstantial evidence. The majority vacates the finding based solely on the latter argument. In my view, neither argument has merit.

### A. The Court Did Not Err in Failing to Give a Circumstantial Evidence Instruction.

Defendant argues the trial court prejudicially erred in failing to give, sua sponte, CALJIC No. 8.83 "and/or" CALJIC No. 8.83.1." CALJIC No. 8.83 (6th ed. 1996) states: "You are not permitted to find a special circumstance alleged in this case to be true based on circumstantial evidence unless the proved circumstance is not only (1) consistent with the theory that a special circumstance is true, but (2) cannot be reconciled with any other rational conclusion. [¶] Further, each fact which is essential to complete a set of circumstances necessary to establish the truth of a special circumstance must be proved beyond a reasonable doubt. [¶] In other words, before an inference essential to establish a special circumstance may be found to have been proved beyond a reasonable doubt, each fact or circumstance upon which that inference necessarily rests must be proved beyond a reasonable doubt. [¶] Also, if the circumstantial evidence is susceptible of two reasonable interpretations, one of which points to the truth of a special circumstance and the other to its untruth, you must adopt the interpretation which points to its untruth, and reject the interpretation which points to its truth. [¶] If, on the other hand, one interpretation of that evidence appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable."

CALJIC No. 8.83.1 (6th ed. 1996) is similar, but specifically addresses specific intent and mental states. It provides: "The [specific intent] [mental state] with which an act is done may be shown by the circumstances surrounding its commission. But you may not find a special circumstance alleged in this case to be true unless the proved surrounding circumstances are not only, (1) consistent with the theory that the defendant had the required [specific intent] [mental state],

2

but (2) cannot be reconciled with any other rational conclusion. [¶] Also, if the evidence as to [any] [specific intent] [mental state] is susceptible of two reasonable interpretations, one of which points to the existence of the [specific intent] [or] [mental state] and the other to the absence of the [specific intent] [or] [mental state], you must adopt that interpretation which points to the absence of the [specific intent] [or] [mental state]. [¶] If, on the other hand, one interpretation of the evidence as to the [specific intent] [or] [mental state] appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." (*Ibid.*)

The federal Constitution does not require the giving of an instruction on evaluating circumstantial evidence where the trial court correctly instructs the jury on reasonable doubt. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1167.) However, this court "has long held" that, under certain circumstances, "trial courts must give 'an instruction embodying the principle that to justify a conviction on circumstantial evidence the facts and circumstances must not only be entirely consistent with the theory of guilt but must be inconsistent with any other rational conclusion.' " (*Ibid.*)

In this case, however, the court did not err in failing to give a circumstantial evidence instruction with respect to lying in wait because two of the circumstances that would have triggered its duty to give such an instruction were lacking. In her separate opinion, Justice Corrigan has explained why one of those circumstances is missing: Sergeant Valdemar's testimony, which is the circumstantial evidence the majority discusses, did not "reasonably support[] an inference that defendant did not act with the required mental state." (Dis. opn. of Corrigan, J., *post*, at p. 3.)

The other circumstance that was lacking was substantial reliance by the prosecution on the circumstantial evidence to prove defendant's guilt. We have long and "consistently" held that a trial court must give a circumstantial evidence instruction *only* when the prosecution "substantially relies on [such] evidence to

3

prove its case." (*People v. Anderson* (2001) 25 Cal.4th 543, 582.) "Conversely, the instruction need not be given when circumstantial evidence is merely incidental to and corroborative of direct evidence . . . ." (*People v. McKinnon* (2011) 52 Cal.4th 610, 676 (*McKinnon*).) Indeed, where circumstantial evidence "is not the primary means by which the prosecution seeks to establish" its case, the instruction "should not be given" because it "may confuse and mislead" the jury. (*Anderson*, *supra*, at p. 582.) Under our decisions, this is true even if the circumstantial evidence is "substantial," arguably "central" to the prosecution's case, and "strong," either in the abstract or in comparison to the "quality of the direct evidence" that it "bolsters, corroborates, or supports." (*McKinnon*, *supra*, at p. 676 & fn. 40.) It is also true even if the defendant's mental state is at issue; a circumstantial evidence instruction is not required if that mental state is "proved by inference drawn from the direct evidence of [the] defendant's conduct," including the defendant's own extrajudicial statements and the testimony of eyewitnesses. (*People v. Wiley* (1976) 18 Cal.3d 162, 175.)

Under these principles, because the prosecution in this case primarily relied on direct evidence to prove the lying-in-wait special circumstance, the trial court did not err in failing to give, sua sponte, a circumstantial evidence instruction in connection with that special circumstance. During discussions about jury instructions, defendant's counsel objected to instructing on lying in wait, arguing there "wasn't sufficient evidence for" doing so. In response, the prosecution relied only on evidence provided by defendant's "own statement." The court agreed with the prosecution, stating: "The evidence supports those comments, including the evidence by Mr. Falconer who was an eyewitness to the shooting."

Consistent with the preceding comments, in its opening argument to the jury after the close of evidence, with respect to the lying-in-wait special circumstance, the prosecution relied on the defendant's confession, the testimony of eyewitnesses, and inferences that could be directly and reasonably drawn from that direct evidence. Specifically, the prosecution argued: "Remember what all

4

the testimony is here?  Jimmy Falconer, the defendant, and Rick Delfin.  What did they say happened here?  Jimmy Falconer said it was like shooting fish in a barrel.  They never gave them a chance.  What does Rick Delfin tell you?  I never saw him.  I didn't think he'd ever stop shooting.  I was sitting in a police car looking at this other guy planning to go talk to this guy, Camacho, when this ambush assault occurred.  What does the defendant say?  They never looked at me.  Why did you hide behind the car?  They never seen me.  What did you do when you popped up?  I shot them when they weren't looking.  That's an ambush.  That's what lying in wait is all about.  This concealment, hiding of himself, is where you get the lying in wait.  He sees the police officer, ducks down, and waits to see whether it's necessary, whether it's appropriate to for him to begin shooting, whether it's going to be necessary to kill the police officers, depending on their conduct.  And he watches and he waits.  And he sees what they do.  And they kind of do what a gang member would expect, they go over and focus on the gang member that's across the street on his way up to Toro's house to ring the bell and kill Toro.  As they're approaching him getting ready to contact him and ultimately arrest him and prevent having Toro killed, this defendant instead of having his homeboy arrested, the focus was on the police officer on the opposite side of the street.  He discharged his assault weapon into Detective Black and killed him."

As is readily apparent, in its opening argument, the prosecution relied on reasonable inferences *from the direct evidence*, and made no reference to expert testimony.  However, in a completely separate part of its opening argument, the prosecution *did* expressly and precisely explain "why gang experts [had been] called":  to address issues related to charges that had a gang component, e.g., "intentional killing by an active street gang member" or "an active participant in a criminal street gang," "crimes committed for the benefit of a criminal street gang," engaging "in a pattern of criminal gang activity," "the primary activities of the gang."  Thus, the record clearly demonstrates that, in its opening argument, the

5

prosecution did not substantially rely on Sergeant Valdemar's testimony to prove lying in wait; indeed, it did not rely on that testimony at all.

The majority ignores this clear record in concluding otherwise, i.e., in finding that the prosecution's opening argument regarding the lying-in-wait special circumstance was "unmistakably a reference to Sergeant Valdemar's testimony."[1] (Maj. opn., *ante*, at p. 27.) It then compounds this factual error with a legal one: engaging in a mode of analysis that we clearly rejected just four years ago. In *McKinnon*, the defendant based his argument that circumstantial evidence was "central to the prosecution's case," such that a circumstantial evidence instruction should have been given, on "the 'quality' of the evidence," asserting that a finding of substantial reliance is appropriate when "the quality of the direct evidence is weak, and the quality of the circumstantial evidence is strong." (*McKinnon*, *supra*, 52 Cal.4th at p. 676 & fn. 40.) We rejected that argument, finding "no persuasive authority for our consideration of [the quality of the evidence] in analyzing whether an instruction on circumstantial evidence was required." (*Id.* at p. 676, fn. 40.) The majority's reasoning here — that the circumstantial evidence "was critical to" the prosecution's case "*because*" it was "the principal evidence in support of the prosecution's theory" (maj. opn., *ante*, at p. 27, italics added) — is virtually the same argument we rejected in *McKinnon* — that the circumstantial evidence "was central to the prosecution's case" (*McKinnon*, *supra*, at p. 676). It rests on the very "factor" — the relative " 'quality' of the evidence" — we held in *McKinnon* should *not* be considered. (*Id.* at p. 676, fn. 40.) Adopting the mode of analysis we rejected in *McKinnon*, the majority in essence concludes that the prosecution substantially relied on

---

[1] Notably, although initially asserting that the prosecution's argument was "unmistakably a reference to" Sergeant Valdemar's testimony (maj. opn., *ante*, at p. 27), two paragraphs later, the majority characterizes the supposed reference as "oblique" (*id.* at p. 28). As I have explained, the record belies either characterization.

6

Sergeant Valdemar's testimony because "the quality of [that] circumstantial evidence is strong" and "the quality of the direct evidence" — defendant's confession and the eyewitness testimony — "is weak" as to the duration of the watching and waiting. (*McKinnon*, *supra*, 52 Cal.4th at p. 676, fn. 40.) Thus, the majority's reasoning is not only factually inconsistent with the record, it is analytically contrary to our recent precedent.[2]

The majority correctly notes that the prosecution addressed Sergeant Valdemar's testimony during its rebuttal argument (maj. opn., *ante*, at p. 27), but the majority's discussion of that circumstance is incomplete and misleading. According to the majority, the prosecution was "responding" to defense counsel's "arguments that there was no premeditation or lying in wait." (*Ibid*.) However, the record shows that, in fact, the prosecution was responding to defense counsel's argument regarding "premeditation," not lying in wait. Specifically, defense counsel charged that the prosecution had "brought" Sergeant Valdemar "in here because [it] knows that [its] evidence *on premeditation* is weak. So [it's] trying to get Sergeant Valdemar up here to say, Oh, yes, if you see someone with a long gun, that means they're prepared to shoot a policeman." (Italics added.) In rebuttal, the prosecution responded that defense counsel's "suggestion that Rich Valdemar was called because our case was weak is so far from the truth." In its ensuing comments, the prosecution stated, among other things: "This is the way [criminal street gangs] deploy their troops. This is the way they commit these types of crimes. They do consider law enforcement's presence. They do bring

---

[2]    The majority's response — that Sergeant Valdemar's testimony "did not bolster any direct evidence of the prosecution's theory" (maj. opn., *ante*, at p. 28) — obviously overlooks the compelling inferences the direct evidence supports (see *post*, at pp. 10-12) and our established rule, as stated above, that a circumstantial evidence instruction is not required where mental state is proved "*by inference* drawn from the direct evidence of [the] defendant's conduct," including the defendant's own extrajudicial statements and the testimony of eyewitnesses. (*People v. Wiley*, *supra*, 18 Cal.3d at p. 175, italics added.)

7

long arms in order to fend off police in the apprehension of their fellow gangsters." Given that the prosecution was responding to defense's counsel comments about the weakness of the evidence "on premeditation," the jury no doubt understood this statement as directed at that issue, not at lying in wait.

In any event, although briefly discussing Sergeant Valdemar's testimony, the prosecution, consistent with its focus during opening argument, spent most of its rebuttal emphasizing the inferences supported by the following *direct evidence* provided by defendant's confession and the eyewitness testimony: (1) defendant went to a gang meeting where he and other gang members agreed to go to Toro's house and shoot him in retaliation for an earlier drive-by shooting; (2) defendant retrieved a fully automatic assault weapon he had earlier loaded, and took it with him to shoot Toro; (3) as defendant was exiting his parked car with the assault weapon, he saw the police officers approaching in their car and ducked down behind his car to conceal himself; (4) while he was behind the car, he continued watching the police as they moved down the street, approached his position, and started looking at Camacho; and (5) in order to prevent the officers from sending Camacho to jail for violating parole, defendant stood up and started shooting at them with the assault weapon. Under *McKinnon*, even assuming "the incriminating effect of" Sergeant Valdemar's testimony was "substantial," because that testimony "complemented, and was merely corroborative of, defendant's admissions" and other eyewitness testimony, the trial court "was not obligated to instruct on circumstantial evidence."[3] (*McKinnon*, *supra*, 52 Cal.4th at p. 676.)

---

[3] In another part of its opinion, the majority correctly holds that, with respect to the prosecution's theory of premeditated and deliberate murder, no circumstantial evidence instruction was required because the prosecution emphasized the direct evidence — defendant's confession and the manner of killing — and did not substantially rely on Sergeant Valdemar's testimony. (Maj. opn., *ante*, at pp. 35-36.) The majority fails to explain how it justifies reaching the opposite conclusion with respect to lying in wait, given that the prosecution's

*(footnote continued on next page)*

### B. Any Error in Failing to Give a Circumstantial Evidence Instruction Was Harmless.

Even had the trial court erred in failing to give a circumstantial evidence instruction as to lying in wait, reversal would be unwarranted because there is no reasonable probability defendant would have obtained a more favorable result had the court given the instruction.

In concluding otherwise, the majority reasons: (1) Sergeant Valdemar's testimony "was the principal evidence" supporting "the prosecutor's theory" that the period of watching and waiting began when defendant spotted the officers; (2) a properly instructed jury might have "discounted" Sergeant Valdemar's testimony, which would have foreclosed the prosecutor's theory; (3) absent Sergeant Valdemar's testimony, "[i]t is unlikely" the jury would have concluded that the period of watching and waiting began when defendant spotted the officers; (4) instead, given that defendant's confession "makes no mention of any thought about killing the police until they approached Camacho," the jury would likely have concluded that the period of watching and waiting did not begin until defendant "noticed the police looking at Camacho"; and (5) "[i]t is unlikely" the jury would have concluded that "the very brief, indeterminate time between" the moment defendant saw the officers looking at Camacho and the moment defendant started shooting was "sufficiently substantial" to prove the truth of the special circumstance allegation. (Maj. opn., *ante*, at p. 30.)

The majority's analysis contains several errors. First, as demonstrated above, Sergeant Valdemar's testimony was *not* the principal evidence on which

---

*(footnote continued from previous page)*

remarks about Sergeant Valdemar's testimony were expressly directed at the issue of premeditation, not lying in wait, and that the prosecution emphasized the same direct evidence in arguing both issues to the jury.

9

the prosecution relied to prove lying in wait; instead, the prosecution relied principally *on the direct evidence* — defendant's confession and the eyewitness testimony — and the reasonable inferences that direct evidence supported. Indeed, the prosecution did not even mention Sergeant Valdemar's testimony until its rebuttal, and then only in response to defendant's charge about the weakness of the prosecution's case on premeditation. Thus, the discounting of Sergeant Valdemar's testimony would not have foreclosed the prosecution's theory; it would have had little, if any, effect on that theory.

Second, based on the direct evidence alone, it is highly likely the jury would have concluded that the period of watching and waiting began when defendant spotted the officers, and highly *unlikely* it would have concluded that the period did not begin until defendant saw the officers looking at Camacho. That direct evidence shows the following: Out of loyalty to his own gang and to retaliate against Toro's gang for a drive-by shooting, defendant retrieved a fully automatic AR-15 assault weapon he had earlier loaded with about 30 rounds of ammunition, went to a meeting with other gang members, and made a plan to go together to Toro's house and kill him. Pursuant to the plan, defendant, carrying the assault weapon, followed a car containing Camacho and other gang members to Toro's street. There, after parking along the sidewalk, defendant started exiting his car with his weapon. He saw the officers approaching in a police car. At this point, Camacho, whom defendant knew to be violating parole by carrying a weapon, was already walking on the sidewalk, in plain view of the officers. Upon spotting the approaching police car, defendant did not throw his weapon away or flee. Instead, he ducked down behind his car, still holding the AR-15. But even when he ducked down, he did not completely conceal himself. Instead, he kept a close watch on the officers as they slowly moved closer to Camacho. With the police car still one or two car lengths away, defendant saw the officers looking at Camacho and decided he would shoot them in order to prevent them from taking Camacho to jail for violating parole. When the police car was right next to him,

10

he opened fire, shooting at least 28 times. On this evidence, there is no reasonable chance that, absent Sergeant Valdemar's testimony, the jury would have found that when defendant, a loyal gang member who had armed himself with a loaded, fully automatic assault weapon in order to carry out a retaliatory hit with Camacho and other members of his gang, spotted the officers approaching Camacho, ducked down with his weapon, and continued tracking the officers' movements, he was not contemplating shooting them in order to protect Camacho. Instead, it is highly likely the jury would have concluded that defendant began contemplating shooting the officers at virtually the moment he ducked down with his weapon and started tracking their movements as they slowly approached.

Third, under the instructions the jurors received, even had they concluded that the period began when defendant saw the officers looking at Camacho, there is no reasonable probability they would have reached a different conclusion based on the direct evidence. In his confession, defendant stated that the police car was "just like two cars — like one car" north of his position when he saw the officers looking at Camacho, and was "right next to" his position, "about 10 feet away," when the shooting occurred. Defendant did not state that he started shooting as soon as the car pulled up right next to him. Detective Delfin, however, did provide relevant evidence on this point. He testified that, as he was driving down Lime Avenue, he "slowed up" upon spotting a double parked car and "stopped about two car lengths behind" it. He then saw Camacho "by the back of the bumper" of the double-parked car and "made eye contact" with him. He "continued observing" and making "eye contact with" Camacho as Camacho "walked in an eastbound direction across Lime." Based on his observations of Camacho's "walk" and "mannerisms," Detective Delfin "formed the opinion" that Camacho might be carrying a firearm. He decided to "go get this guy and talk to him," but before he was able to exit his car, "someone started unloading on" him and Detective Black. Thus, the evidentiary record shows that, between the time defendant saw the officers looking at Camacho and the time defendant started

11

shooting, the police car slowly moved forward one or two car lengths until stopping in a location right next to defendant, and Detective Delfin then watched Camacho walk across the street, made sustained "eye contact with" Camacho, observed Camacho's walk and mannerisms long enough to form the opinion that he might be carrying a firearm, and made a decision to go talk to Camacho.

Under the jury instructions, on this direct evidence alone, there can be no doubt the jury would have found the period of watching and waiting sufficient. On this issue, the court correctly instructed the jury that "[t]he lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." Only moments before giving that instruction, the court instructed the jury that "[t]he law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated," that "the true test" for premeditation and deliberation "is not the duration of time but rather the extent of the reflection," that "the slayer must weigh and consider the consequences and consider the question of killing and the reasons for and against such choice, and having in mind the consequences, he chooses to and does kill," and that "[a] cold, calculated judgment and decision may have been arrived at in a short period of time." Under these instructions, the jury would surely have found that the "duration" of the period was "such as to show a state of mind equivalent to premeditation or deliberation" given the evidence that defendant, having watched the officers approach Camacho and decided to kill them when he saw them looking at Camacho, waited to begin firing long enough for them to drive slowly forward another one or two car lengths, stop their car right next to his position, make sustained eye contact with Camacho, and observe him long enough to form an opinion he might be carrying a firearm.

Indeed, the majority itself confirms this conclusion by holding that, as to the first degree murder conviction based on the "theory of premeditation and

12

deliberation," any error in failing to give a circumstantial evidence instruction was harmless. (Maj. opn., *ante*, at p. 36.) As explained above, the prosecution's remarks during rebuttal about Sergeant Valdemar's testimony — as well as defense counsel's remarks on that subject — were expressly directed, not at the issue of lying in wait, but at the issue of premeditation. The majority nevertheless finds no "reasonable probability" that a circumstantial evidence instruction "would have resulted in a more favorable verdict" on the issue of premeditation and deliberation. (*Ibid.*) "The strong direct evidence of premeditation and deliberation," the majority explains, "means that even if the jury discounted Sergeant Valdemar's testimony," "there is no reasonable chance it would have returned a second degree rather than first degree murder verdict." (*Ibid.*) I agree. But the majority fails to explain how a jury that necessarily would have found the period to be of sufficient duration to constitute premeditation and deliberation would not necessarily *also* have found, in accordance with the trial court's correct jury instructions on premeditation and lying in wait, the *very same period* to be of a "duration . . . such as to show a state of mind equivalent to premeditation or deliberation." Thus, under the jury instructions, the majority's harmless error finding with respect to premeditated and deliberate murder compels a similar conclusion with respect to lying in wait.

Rather than respond to this analysis, the majority mischaracterizes it. Contrary to the majority's suggestion, I do not contend that a conclusion "there was insufficient evidence of" lying-in-wait murder "mean[s] there was no premeditation and deliberation," or that these different forms of murder "must be established by" the same "route." (Maj. opn., *ante*, at p. 32.) Indeed, neither I *nor the majority* concludes "there was insufficient evidence of lying-in-wait." (*Ibid.*) What I *do* contend is that given the majority's correct conclusion that "there is no reasonable chance," in light of "[t]he strong direct evidence of premeditation and deliberation" — defendant's "confession and the manner of killing" — that the jury would not have found that defendant had that mental state (*id.* at p. 36), it

13

logically follows that "there is no reasonable chance" (*ibid.*), in light of that same direct evidence and the applicable jury instructions, that the jury would not have found the period in question to have been of a "duration . . . such as to show a state of mind equivalent to premeditation or deliberation." The majority fails to explain its contrary conclusion.

### C. The Evidence Was Sufficient.

On the claim the majority does not reach — the sufficiency of the evidence — defendant contends only that the period of watching and waiting was of insufficient duration. He is incorrect.

"The purpose of the watching and waiting element is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse." (*People v. Stevens* (2007) 41 Cal.4th 182, 202 (*Stevens*).) We have never required a "fixed, quantitative minimum time" limit as to this requirement. (*People v. Bonilla* (2007) 41 Cal.4th 313, 333.) "Indeed, the opposite is true, for we have previously explained that '[t]he precise period of time is . . . not critical.' [Citation.]" (*People v. Moon* (2005) 37 Cal.4th 1, 23.) "Even a short period of time is sufficient to overcome an inference that a defendant acted rashly. [Citation.]" (*People v. Russell* (2010) 50 Cal.4th 1228, 1245.) As the trial court instructed the jury, the period "need not continue for any particular length ' "of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." ' " (*Stevens*, *supra*, at p. 202, fn. omitted.)

Applying these principles and viewing the record, as discussed above, in the light most favorable to the judgment, I conclude that a reasonable trier of fact could find this element proved beyond a reasonable doubt by evidence that defendant, having carefully watched the officers from his hidden position and having decided to shoot them in order to prevent their apprehension of Camacho, then waited until they slowly pulled up next to him, stopped, and watched Camacho cross the street, before he stood up and opened fire. As the majority

14

correctly concludes, this evidence provides "little indication that the murder was rash and impulsive." (Maj. opn., *ante*, at p. 34.) Indeed, defendant's behavior "dispel[s] any inference that he killed as a result of rash impulse"; it "is completely consistent with, and "provides substantial evidence for, the watching and waiting element of the lying-in-wait special circumstance." (*Stevens*, *supra*, 41 Cal.4th at p. 203; see *People v. Lewis* (2008) 43 Cal.4th 415, 511 [evidence that the defendant watched the victim "for at least the time it took her to open the passenger door of her car and begin 'doing something in . . . the backseat' " was sufficient to establish watching and waiting element].)

### 2. Defense Counsel's Erroneous Statements About Life Without the Possibility of Parole

During his closing argument in the penalty phase retrial, defense counsel told the jury that a sentence of life without the possibility of parole "means that you will never get out." The prosecutor objected and, outside of the jurors' presence, asserted that "case law does not allow you [to argue] an inaccurate statement." The trial court commented that "the correct statement of the law is that you are to assume that it means that." Defense counsel, without disagreeing with the court, then stated, "I would ask you to admonish them now." The court did as defense counsel requested, telling the jurors: "Life without the possibility of parole, that sentence, you are to assume that it means that. That is the statement of the law. You are to assume [it] means life without the possibility of parole." Defense counsel then added: "[Y]ou are to assume that that's what it means because that's what it does mean. It means that Ramon Sandoval will spend the rest of his life in a California maximum security prison." The court interrupted counsel and stated: "The jury is not allowed to accept the statement that life without the possibility of parole means exactly what it is. You're to assume that that's what it means."

15

Consistent with defense counsel's failure to disagree with the trial court's statement, defendant concedes on appeal that, under our case law, it was "permissible" for the court to tell the jury "to *assume*" that a sentence of life without the possibility of parole would result in a capital defendant "spending the rest of his/her life in prison." Indeed, at the time of defendant's penalty phase retrial in 2003, we had expressly so held in numerous cases.[4] (*People v. Kipp* (1998) 18 Cal.4th 349, 378–379; *People v. Fierro* (1991) 1 Cal.4th 173, 250; *People v. Thompson* (1988) 45 Cal.3d 86, 131 (*Thompson*).)

However, citing *Thompson*, defendant argues that the trial court prejudicially erred in precluding his counsel from telling the jury that a sentence of life without the possibility of parole would "*in fact* result in the defendant never being released from prison," and in "correcting" his counsel's statement that the sentence "would actually result in life imprisonment." The majority agrees with defendant. (Maj. opn., *ante*, at pp. 59-61.) For reasons that follow, I do not.

As the prosecution correctly asserted at trial in support of its objection, "case law does not allow [counsel] to . . . argue an inaccurate statement." "Arguments of counsel [that] misstate the law are subject to objection and to correction by the court." (*Boyde v. California* (1990) 494 U.S. 370, 384.) Indeed,

---

[4]     In 2010, years after defendant's retrial, we held that a trial court "did not err by refusing" to give such an instruction because stating that jurors "should 'assume' or 'presume' that the sentence will be carried out obscures the purpose of the instruction" and "is misleading in the sense that, although other presumptions and assumptions that juries are instructed to consider have their bases in logic and experience, a presumption or assumption that the sentence will be carried out is, in fact, contradicted by the real possibility, of which some jurors may be aware, that the sentence will not be carried out." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 206.) We did not hold that courts that had followed our prior decisions and given such an instruction had erred, but we suggested that, "[i]n the future," a court "might" instead instruct jurors that, in determining punishment, they " 'must not be influenced by speculation or by any considerations other than those upon which I have instructed you.' " (*Ibid*.)

16

a trial judge has both "the right" and "the duty to curtail defense counsel," not just the prosecution, "from making incorrect or incomplete statements of law." (*People v. Ott* (1978) 84 Cal.App.3d 118, 132 (*Ott*).)  Thus, although a court has discretion to "allow counsel to incorporate *correct* statements of law in [their] argument," "it *must* sustain an objection to an *incorrect* statement of law." (*People v. Suddeth* (1966) 65 Cal.2d 543, 548, italics added (*Suddeth*).)

We have long and consistently held that telling jurors the defendant, if sentenced to life without the possibility of parole, will never be released and will remain in prison for the rest of his or her life, or will never be considered for parole and will not be paroled at any time, is "an incorrect statement of the law." (*People v. Adams* (2014) 60 Cal.4th 541, 581; *People v. Whalen* (2013) 56 Cal.4th 1, 88; *People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 204; see also *People v. Smith* (2003) 30 Cal.4th 581, 635 (*Smith*) [it would be "inaccurate" to tell jurors that a sentence of life without possibility of parole " 'means imprisonment for the rest of [the defendant's] natural life' "].)  Such statements are "erroneous" in light of the Governor's commutation and pardon powers and the possibility that the law's sentencing provisions might be invalidated.  (*People v. Holt* (1997) 15 Cal.4th 619, 688.)  As we have explained, "[t]he Governor may ameliorate any sentence by use of the commutation or pardon power . . . . " (*People v. Arias* (1996) 13 Cal.4th 92, 172.)  Thus, under our decisions, the majority is simply incorrect in asserting, without citation of authority, that defense counsel's remarks were "legally accurate."  (Maj. opn., *ante*, at p. 60.)

It inexorably follows from these well-established principles that, upon the prosecution's objection, the trial court in this case did not err in precluding defense counsel from making the incorrect argument that life without the possibility of parole "means" that the defendant "will never get out" and "will spend the rest of his life in a California maximum security prison."  Indeed, consistent with these principles and this conclusion, in *Smith*, *supra*, 30 Cal.4th at page 636, we unanimously rejected the defendant's contention that the trial court had erred in

17

"sustain[ing] an objection when defense counsel started to argue that defendant would never have a parole hearing." "[T]his argument," we reasoned, "would have been inaccurate." (*Ibid.*) Following *Smith*, we should similarly reject defendant's argument.

In reaching a contrary conclusion, the majority ignores these bedrock principles and declines to follow *Smith*, choosing instead to rely entirely on dictum defendant cites from *Thompson*. As here relevant, our *holding* in *Thompson* was that the trial court had properly declined to instruct jurors that if they selected a death sentence, " 'the sentence will be carried out,' " and that if they selected life without the possibility of parole, " 'the defendant will never be released from prison.' " (*Thompson*, *supra*, 45 Cal.3d at p. 129.) Such an instruction is "[in]accurate" and "incorrect," we explained, because it "ignores" the superior court's statutory power to reduce a sentence of death and the Governor's power of commutation. (*Id*. at p. 130.) In a footnote, we added the following statement, which is the foundation of the majority's conclusion: "Defense counsel's remarks to the jury during closing argument as to what life without possibility of parole would really mean and what an unending punishment it would be were . . . within the scope of legitimate argument to the extent the remarks impressed on the jury the gravity of its task." (*Id.* at p. 131, fn. 29.)

The majority's reliance on this statement is suspect for several reasons. First, it was obviously dictum; it was completely unnecessary to our holding, and thus does not, as the majority's asserts, establish a "rule." (Maj. opn., *ante*, at p. 61.) Indeed, just three years after deciding *Thompson*, in *People v. Ashmus* (1991) 54 Cal.3d 932, 960, footnote 5 (*Ashmus*), we not only noted that *Thompson*'s discussion was "dictum," we declared it "open to question."

Second, nowhere in *Thompson* did we set forth what defense counsel actually said in his "remarks to the jury during closing argument." (*Thompson*, *supra*, 45 Cal.3d at p. 131, fn. 29.) For this separate and additional reason, *Thompson*'s dictum does not "set forth" a "rule" (maj. opn., *ante*, at p. 61) that

18

defense counsel, over the prosecution's objection, is entitled to make the definitive, unqualified, and *incorrect* statement that a sentence of life without possibility of parole "means" the defendant "will never get out" and "will spend the rest of his life in a California maximum security prison." Indeed, a careful reading of *Thompson* suggests that, in fact, defense counsel's remarks in that case were similar to *the trial court's statement* in this case that jurors should *assume* the sentence would be carried out, not to the unqualified remarks of defendant's counsel. In announcing our holding, we stated that, because it is generally "beneficial" to "impress[] the jury with the weight of its responsibility," "it was not necessarily error to suggest to them on voir dire that the sentence they decide on will be carried out." (*Thompson*, at p. 131.) Notably, as our opinion discloses, this idea was suggested to the jurors on voir dire by telling them, as the trial court told the jurors here, " 'that they should *assume* the sentence they voted for, whether death or life without possibility of parole, would be carried out.' " (*Id*. at p. 129, italics added.) As the majority explains, the footnote on which it relies "extended" this discussion of the comments during voir dire to defense counsel's remarks during closing argument. (Maj. opn., *ante*, at p. 60; see *Thompson*, *supra*, at p. 131, fn. 29.) It is therefore logical to infer that the closing remarks were similar to those made during voir dire, i.e., that jurors should *assume* the sentence they voted for would be carried out.

This inference is supported by the third and final reason that the majority's reliance on *Thompson* is suspect: in *Thompson*'s dictum, we did not even mention a court's "duty to curtail defense counsel from making incorrect . . . statements of law" (*Ott*, *supra,* 84 Cal.App.3d at p. 132) and to "sustain an objection to an incorrect statement of law" (*Suddeth*, *supra*, at p. 65 Cal.2d at p. 548). Surely, we would have discussed these duties before holding that defense counsel is entitled to make incorrect and misleading statements to the jury during closing argument about the meaning of a life sentence. For all of these reasons, our dictum in *Thompson* is not support for the majority's holding that, over the prosecution's

19

objection, defense counsel was entitled to make the erroneous arguments in question here.

Another good reason for rejecting the majority's holding is the majority's failure to consider the effect of that holding on the prosecution. We have long held that it is improper for the prosecution, in closing statement, to mention or suggest the possibility that the sentence the jury selects will not be carried out. (*People v. Davenport* (1985) 41 Cal.3d 247, 287–288.) Thus, the prosecution has no way to respond to a defense counsel's erroneous argument to a jury that life without the possibility of parole means the defendant will never be released and will die in prison. Neither, the majority holds, is the court entitled to correct defense counsel's misstatement. I see no logic to, justification for, or fairness in a rule that uniquely entitles defense counsel to misstate the law to jurors without response or correction.

Certainly, as the record here demonstrates, the rule the majority announces is not needed to serve the goal *Thompson* mentioned: "impress[ing] on the jury the gravity of its task." (*Thompson*, *supra*, 45 Cal.3d at p. 131, fn. 29.) In this case, defendant's counsel ably accomplished this goal by telling jurors, after the trial court made its ruling, the following: "Well, okay. You're to assume that Ramon Sandoval will spend the rest of his life in a California maximum security prison. Even if he lives to be 100 years old, you're to assume that's where he's going to die. In 10 years, 20 years from now, whenever your children graduate from college or graduate from high school, Ramon Sandoval will still be in a California maximum security prison. It's not a gift. It is an extremely bleak environment. It's one of the bleakest and most terrible environments that you can imagine. And in many ways, it's worse that the death penalty. And the point I think we're trying to make is that life without the possibility of parole is all that society demands in this case. Society will be safe." Surely, these comments adequately "impress[ed] on the jury the gravity of its task." (*Ibid*.)

20

Although we have cited *Thompson*'s dictum since declaring it "open to question" in *Ashmus*, *supra*, 54 Cal.3d at page 960, footnote 5, until today, we have never held that, *over the prosecution's objection*, a defendant is entitled to make the incorrect statements at issue here. In *People v. Nguyen* (2015) 61 Cal.4th 1015, after quoting *Thompson*'s "dicta" (at p. 1087), we held that, because the trial court had "permitted" defense counsel to argue that life without possibility of parole " 'means for the rest of [the defendant's] natural life he is going to be locked up in prison,' " the court did not err in precluding defense counsel from describing the measurements and features of the defendant's prison cell (*id.* at p. 1088). In *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1159, we discussed *Thompson*'s dictum in holding that the trial court had not erred in rejecting the defendant's proposed instruction that life without the possibility of parole "means 'defendant will be imprisoned for the rest of his life,' " but "permit[ting] counsel to argue its substance before the jury." (Italics added.) In these decisions, we cited the fact that defense counsel had been *permitted* to make such comments "without objection" (*Nguyen*, *supra*, 61 Cal.4th at p. 1087) in rejecting claims that it was *otherwise* error to refuse a requested instruction or preclude counsel from making *other* arguments. In neither did we hold or suggest that where, as here, *the prosecution objects*, a trial court *must* allow defense counsel to make the incorrect arguments at issue in this case.[5] In short, there is no precedent in our case law supporting the majority's conclusion.

On the other hand, there *is* precedent to the contrary; as explained above, in *Smith*, *supra*, 30 Cal.4th at page 636, we unanimously rejected a claim that the trial court had erred in "sustain[ing] an objection" to defense counsel's argument

---

[5] Moreover, in *Gutierrez*, we did not set forth the remarks the trial court permitted defense counsel to make (*People v. Gutierrez*, *supra*, 28 Cal.4th at p. 1159), so it is impossible to determine from our opinion whether those remarks were similar to the unqualified remarks at issue here.

21

"that defendant would never have a parole hearing," reasoning that this argument "would have been inaccurate." The majority's reasons for departing from *Smith* are erroneous and unpersuasive. We did not, as the majority asserts (*ante*, at p. 61), simply "note[]" in *Smith*, at page 636, that it was "inaccurate" for defense counsel to tell jurors that the defendant "would never have a parole hearing" if sentenced to life without the possibility of parole. That conclusion was our primary basis for rejecting defendant's complaint that the trial court had "sustained an objection" to defense counsel's "argument." (*Ibid*.) Contrary to the majority's suggestion (maj. opn., *ante*, at p. 61), the force and authority of this conclusion are not lessened by our subsequent comment in *Smith* that, "[i]n any event," because "both sides argued, *without objection*, that a life verdict would mean [the] defendant would die in prison," "[t]he jury understood the significance of its choices." (*Smith*, at p. 636, italics added.)

Nor is the majority correct in suggesting that we failed in *Smith* to provide an "explanation" for our conclusion. (Maj. opn., *ante*, at p. 61.) Earlier in the same paragraph, we held that the trial court had not erred in refusing to instruct the jury that life without the possibility of parole " 'means imprisonment for the rest of [the defendant's] natural life,' " explaining that such an instruction "would have been inaccurate because the Governor has the power to commute a sentence. [Citations.]" (*Smith*, *supra*, 30 Cal.4th at p. 635.) We were clearly referring to this explanation when, in later rejecting the related claim that the trial court had erroneously "sustained an objection" to defense counsel's similar argument, we stated: "*Again*, this argument would have been inaccurate." (*Id*. at p. 636, italics added.)

Consistent with *Smith* and the well-established legal principles discussed above, we should hold that where, as here, the prosecution objects to defense counsel's inaccurate and erroneous statements about the meaning of a sentence of life without the possibility of parole, a trial court does not err in sustaining that objection. We should not, as does the majority, now transform *Thompson*'s

22

dictum — which cites no authority, fails to discuss established principles, and does not even identify the remarks in question — into a "rule" that a trial court commits error in precluding defense counsel, upon the prosecution's objection, from making such misstatements. (Maj. opn., *ante*, at p. 61.)

Finally, even were I to adopt the majority's rule and find error, like the majority, I would affirm for lack of prejudice. However, unlike the majority, I see no reason to analyze this issue under — or even to mention — the approach that some federal authorities have taken when the government fails to make a harmless error argument. (See maj. opn., *ante*, at pp. 61-62.) In his briefs, defendant nowhere mentions that approach, let alone urges us to adopt it. Thus, the majority has needlessly and improperly injected into this case an issue the parties have neither raised nor briefed.

Moreover, the federal approach is clearly at odds with our state *constitutional* duty as a reviewing court. Article VI, section 13 of the California Constitution *precludes* a reviewing court from setting aside a judgment because of an instructional or procedural error "unless, *after an examination of the entire cause, including the evidence*, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Italics added.) As the majority explains, the "plain meaning of" this binding constitutional provision "is that a reviewing court may not reverse a judgment without addressing harmless error," even if the People fail to address that issue in their responding brief. (Maj. opn., *ante*, at p. 61.) Thus, even if, as the majority asserts, "some federal authorities have held that a reviewing court has discretion [not] to conduct a harmless error inquiry" under these circumstances (*id.* at p. 62), a *California* reviewing court does not. In short, the government's failure to offer " 'guidance' " on the issue of prejudice (*id.* at p. 61) does not affect a California reviewing court's *constitutional duty* to "examin[e] . . . the entire cause, *including the evidence*" (Cal. Const., art. VI, § 13, italics added) — i.e., to " 'search[] the record' " (maj. opn., *ante*, at p. 61) — in determining whether there has been "a

23

miscarriage of justice" (Cal. Const., art. VI, § 13). Neither is there any logical or persuasive reason why that failure should affect the standard a reviewing court applies to determine that same issue. In other words, whether the record establishes the constitutionally mandated criterion for reversal — "a miscarriage of justice" (*ibid.*) — should not depend in any way on whether the People make a harmless error argument. I disagree with the majority's discussion insofar as it suggests otherwise.

CHIN, J.

**I CONCUR:**

**CORRIGAN, J.**

24

**DISSENTING OPINION BY CORRIGAN, J.**

I respectfully dissent from the majority's reversal of the lying-in-wait special circumstance. (Pen. Code, § 190.2, subd. (a)(15).) The majority concludes defendant was prejudiced by the court's failure to instruct on circumstantial evidence as it relates to the lying-in-wait special circumstance. Specifically, such an instruction would have stated that if circumstantial evidence supports multiple reasonable conclusions and one of those conclusions supports an inference that the special circumstance is not true, then the jury must conclude the allegation has not been proven by the circumstantial evidence. (See CALCRIM No. 704 [Special Circumstances: Circumstantial Evidence—Sufficiency]; CALJIC Nos. 8.83 [Special Circumstances—Sufficiency of Circumstantial Evidence—Generally], 8.83.1 [Special Circumstances—Sufficiency of Circumstantial Evidence to Prove Required Mental State].) Defendant did not request such an instruction, but the majority concludes the trial court should have given it sua sponte. (Maj. opn., *ante*, at pp. 27-28.)

CALJIC No. 8.81.15 (6th ed. 1996) (Special Circumstances—Murder While Lying in Wait), as given, informed the jury that it could find the lying-in-wait special circumstance true if defendant intentionally killed the victim and the murder was committed while lying in wait. The instruction defined "lying in wait" as "a waiting and watching for an opportune time to act, together with a concealment by ambush or by some other secret design to take the other person by surprise. The lying in wait need not continue for any particular period of time

provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation."

The truth of this special circumstance thus turned on whether defendant was "waiting and watching for an opportune time to act." The majority fails to distinguish between direct and circumstantial evidence. Defendant's confession was direct evidence of his own mental state. Sergeant Valdemar's testimony was circumstantial in that it related facts supporting a different conclusion about that same question. Valdemar testified that gangs "often use military type tactics," including having a person with a long firearm who "would take a position of advantage that would allow him to cover the people with hand guns who would approach the house, possibly also acting as lookouts on either end of the street . . . ." Gangs also anticipate police intervention and "it would be the backup man's duty to take them on and pin them down or kill them if possible." The majority reasons that "[a]lthough there was evidence that Sandoval was hiding and waiting and watching as soon as the police appeared on Lime Avenue, Sergeant Valdemar's testimony was the principal evidence in support of the prosecution's theory that Sandoval was watching and waiting *for an opportune time to commit the murder* from the moment he spotted the police." (Maj. opn., *ante*, at p. 27.) This testimony was in contrast to the defense claim that defendant was not watching and waiting for an opportune time to act, but merely hiding from police when he ducked behind a car as he saw police approach. The only evidence cited by the defense in support of its theory was the timeline of events recounted by defendant in his confession and his own direct statements about what he saw and did.

On these facts, I disagree the trial court erred. The applicable rule on this is well established. " '[W]hen the *only* inference to be drawn from circumstantial evidence points to the existence of a requisite mental state, a circumstantial

2

evidence instruction *need not be given sua sponte.*' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1142, italics added; see *People v. Morrisson* (1979) 92 Cal.App.3d 787, 791-794; see also *People v. Dunkle* (2005) 36 Cal.4th 861, 928 (*Dunkle*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Heishman* (1988) 45 Cal.3d 147, 167, abrogated on another ground by *People v. Diaz* (2015) 60 Cal.4th 1176, 1190; *People v. Wiley* (1976) 18 Cal.3d 162, 175 (*Wiley*).)

The only relevant circumstantial evidence cited by the majority is Sergeant Valdemar's testimony. Yet, the majority fails to explain how that testimony, if believed, reasonably supported an inference that defendant did not act with the required mental state. Sergeant Valdemar's testimony that gangs "usually" are prepared for police intervention and it is the duty of the person with the long firearm to "pin them down or kill them if possible" supports the inference that *defendant* was so prepared and intended to do so as he sought cover from the approaching officers. If the jury believed *this* interpretation of Valdemar's testimony, the only reasonable conclusion to be drawn was that defendant was watching the officers and waiting for an opportune time to shoot and thus acted with the requisite mental state. The majority suggests the jury could have rejected the prosecution's theory based upon defendant's confession. (Maj. opn., *ante*, at pp. 29-30.) It could have done so. But in such a case, it would have *rejected the circumstantial evidence* and *accepted* defendant's own direct evidence.

Although the majority disagrees with this analysis, its attempt to refute it only bears it out. The majority asserts: "A reasonable juror, while believing the gang expert, might have inferred that his testimony about how street gangs *usually* think and act did not prove that Sandoval thought or acted that way in this instance. Such a juror could reasonably refuse to credit the prosecution's theory about what Sandoval was thinking when he first saw the police unless Sergeant

3

Valdemar's testimony was supported by direct evidence of Sandoval's mental state at the time. This view does not posit that the jury '*rejected the circumstantial evidence*' (dis. opn., *post*, at p. 3); it posits only that the jury reasonably rejected the inference that the prosecution wanted it to draw from that evidence." (Maj. opn., *ante*, at pp. 29-30.)

However, in this scenario, the jury "refuse[s] to credit the prosecution's theory" and "reject[s] the inference that the prosecution wanted it to draw from that evidence" based upon its evaluation of the *direct* evidence of defendant's confession. Contrary to the majority's suggestion, the circumstantial evidence instruction is not intended to address a potential conflict between direct and circumstantial evidence. That instruction addresses the danger that a jury would rely on circumstantial evidence to convict even though the same evidence may reasonably support a finding of innocence. That simply is not the case here. The majority points to no interpretation under which Valdemar's testimony could be understood to support an interpretation reasonably supporting a not guilty finding.

In sum, "[t]he fact that the elements of a charged offense include mental elements that must necessarily be proved by inferences drawn from circumstantial evidence does not alone require an instruction on the effect to be given such evidence however. The contrary is usually the rule." (*Wiley, supra,* 18 Cal.3d at p. 175; see *Dunkle, supra,* 36 Cal.4th at p. 928.) The circumstantial evidence at issue must be both substantially relied upon by the prosecution *and* support at least one interpretation pointing to innocence. Because the only reasonable inference *from Valdemar's testimony* was that defendant acted with the required mental state, the trial court did not err in failing to instruct the jury sua sponte regarding circumstantial evidence. I would affirm the judgment of conviction in its entirety.

**I CONCUR:**                                              **CORRIGAN, J.**

**CHIN, J.**

4

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Sandoval
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S115872
**Date Filed:** December 24, 2015
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Joan Comparet-Cassani

_____

**Counsel:**

Victor S. Haltom, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Jaime L. Fuster and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Victor S. Haltom
428 J Street, Suite 350
Sacramento, CA 95814
(916) 444-8663

Timothy M. Weiner
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 897-4922